[No. 31171-9-I.   Division One.   January 10, 1994.]

SUSAN M. THOMPSON, *Appellant,* v. BERTA ENTERPRISES, INC., ET AL, *Respondents.*

---

*Patricia S. Woodall* and *Shepherd, Abbott & Woodall*, for appellant.

*Craig P. Hayes* and *Ludwigson, Thompson, Hayes & Bell*, for respondents.

AGID, J. — Susan Thompson appeals the trial court's order reducing the jury verdict or, in the alternative, granting Mid-Mac Enterprises, Inc. (Mid-Mac) a new trial in her sexual harassment claim. Mid-Mac cross-appeals the trial court's denial of its motions for a directed verdict and judgment notwithstanding the verdict, its instruction to the jury that Mid-Mac could be held strictly liable for quid pro quo harassment, and its judgment holding the defendants jointly and severally liable for Thompson's costs and attorney fees. We conclude that an employer is strictly liable for its supervisory personnel's quid pro quo harassment of an employee and that the trial court erred in granting Mid-Mac a new trial.

We therefore affirm in part and reverse in part and reinstate the jury's verdict for Thompson.

## FACTS

Susan Thompson was employed as a sales clerk at Starvin' Sam's (Sam's) in Lynden, Washington, from July 12, 1989 to September 15, 1990. Sam's was owned by Mid-Mac Enterprises and run by Berta Enterprises pursuant to a management agreement between the two companies. Under the agreement, Zouheir Fares, the president of Berta, was to supervise the store. Mid-Mac remained the employer of all other employees of the store. This arrangement continued until June 1, 1990, when Mid-Mac transferred the assets of the store to Berta. At all times during Thompson's employment, Fares was the president of Berta, the manager of Sam's and Thompson's immediate supervisor. As Thompson's supervisor, Fares had authority to make decisions about her work schedule and pay raises.

Thompson was subjected to continuous sexual harassment by Fares while she worked at Sam's.[1] The harassment consisted of unwelcome sexual comments and physical contact. At one point, Fares offered Thompson $200 of his own money to have sex with him. When she refused, she noticed that her hours of work were decreased. In January 1990, Fares suggested to Thompson that she could become the assistant manager at Sam's. This offer, however, was linked to Thompson's acquiescence to Fares' proposals, and Thompson was never given the position. Instead, Fares continued interviewing outside applicants for this position, "screening" them by gender and physical appearance. In June 1990, Thompson did not receive an anticipated pay raise. She asked Fares if the reason she did not receive the raise was because of her refusal to have sex with him, and he indicated that was the case. Thompson never informed Mid-Mac of this harassment.

---

[1] The circumstances surrounding the harassment are not challenged by Mid-Mac. Only the facts relevant to Thompson's quid pro quo claim are set out here because Thompson's hostile work environment theory was not submitted to the jury.

Thompson filed an administrative complaint with the Human Rights Commission in July 1990. On August 28, 1990, Thompson filed a suit for sexual discrimination and harassment pursuant to RCW 49.60.030 and 49.60.180 naming Fares, Berta and Mid-Mac as defendants. Mid-Mac was the only defendant present at trial; neither Fares nor Berta appeared or was represented.

At trial, Mid-Mac moved for dismissal based on a lack of evidence of its knowledge of the harassment. Mid-Mac contended that, in order to establish employer liability for harassment, an employee must establish that the employer knew or should have known of the harassment. The trial court ruled that there was insufficient evidence of Mid-Mac's knowledge of Fares' conduct to instruct the jury on a hostile work environment theory. The jury was instructed on a quid pro quo theory of liability, however, based on the court's ruling that Mid-Mac could be held strictly liable for this type of harassment. The trial court also denied Mid-Mac's request to have its liability cut off on the date the store's assets and operations were transferred to Berta.

The jury returned a special verdict awarding Thompson the following damages: $75,000 against Mid-Mac; $75,000 against Berta; and $128,000 against Fares. Mid-Mac moved for judgment notwithstanding the verdict and/or a new trial. The trial court granted the motion for a new trial, but also ruled that if Thompson consented to a reduction in the jury verdict to $25,000, exclusive of attorney fees and costs, the motion for a new trial would be denied and judgment would be entered for the reduced amount. Thompson refused to consent to the reduction. An order granting a new trial was entered as to all defendants on May 29, 1992. This appeal followed.

QUID PRO QUO HARASSMENT

■ ■ Under Washington's Law Against Discrimination, "[i]t is an unfair practice for any employer . . . [t]o discriminate against any person in compensation or in other terms or conditions of employment because of [such person's] . . . sex". RCW 49.60.180(3). Sexual harassment as a working condi-

tion creates a barrier to gender equality in the workplace, and it is a form of discrimination actionable under the statute. *Glasgow v. Georgia-Pacific Corp.*, 103 Wn.2d 401, 405, 693 P.2d 708 (1985). Although the delineation is not always clear, sexual harassment claims against an employer are generally categorized as involving a hostile work environment or quid pro quo harassment. Under a hostile work environment claim, the employee seeks to hold her employer liable for a hostile or offensive work environment created by her supervisor or co-worker. In a quid pro quo harassment claim, an employee seeks damages from her employer for a supervisor's or the employer's extortion or attempted extortion of "sexual consideration . . . as a quid pro quo for job benefits". *Glasgow*, 103 Wn.2d at 405; *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986).

The elements of and standard for employer liability for quid pro quo harassment by a supervisor have not been decided in this state. In this case we address this issue of first impression and hold that an employer is strictly liable for quid pro quo harassment perpetrated by its supervisory personnel.[2]

█ In deciding this issue, we look to federal precedent for guidance. Although interpretations of Title VII of the Civil Rights Act of 1964[3] are not binding, they are instructive.[4] The court below relied primarily on *Henson v. Dundee*, 682

---

[2]We address only this narrow issue and express no opinion on the hostile work environment claims against Berta and Fares which are not before us.

[3]Civil Rights Act of 1964 §§ 701 *et seq.*, 78 Stat. 253 (current version at 42 U.S.C. §§ 2000e *et seq.*).

[4]Although not all portions of Washington's Law Against Discrimination are similar to their federal counterparts, the portion of the statute involved here is substantially similar to the corresponding provision in Title VII. RCW 49.60.180 provides:

It is an unfair practice for any employer:

. . . .

(3) To discriminate against any person in compensation or in other terms or conditions of employment because of age, sex, marital status, race, creed, color, national origin . . ..

F.2d 897 (11th Cir. 1982), in instructing the jury that Mid-Mac could be held strictly liable for any quid pro quo harassment perpetrated by Fares. The *Henson* court held that an employer is strictly liable for the actions of its supervisors that amount to sexual discrimination or sexual harassment resulting in tangible job detriment to the subordinate employee. 682 F.2d at 910. As the court in *Henson* recognized, imposing strict liability for quid pro quo harassment results in differing treatment of employer liability in those cases from that imposed in hostile work environment cases. 682 F.2d at 910. The court in *Henson* justified the difference on the basis that, where quid pro quo harassment is involved, the supervisor relies on the actual or apparent authority inherent in the supervisory position to extort sexual favors. 682 F.2d at 910. The court reasoned that because actual or apparent authority has been invested in the supervisor by the employer, the latter should be strictly liable for the misuse of that authority. 682 F.2d at 910.

We find the reasoning in *Henson* on this issue persuasive and hold that the trial court did not err in instructing the jury that an employer is strictly liable for quid pro quo harassment.[5] Adopting this standard is sound public policy

---

Section 2000e-2(a) of the Civil Rights Act of 1964 provides:
      It shall be an unlawful employment practice for an employer —
            (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]
42 U.S.C. § 2000e-2(a)(1).

The Supreme Court of Washington often relies on federal precedent in construing RCW 49.60. *See, e.g., Glasgow,* 103 Wn.2d at 406 n.2; *Davis v. Department of Labor & Indus.,* 94 Wn.2d 119, 125, 615 P.2d 1279 (1980).

[5]We also adopt the *Henson* court's articulation of the elements that must be proved to establish a cause of action for quid pro quo harassment, modified slightly to reflect the statutory language of RCW 49.60.180. In order to establish quid pro quo harassment under RCW 49.60 an employee must prove (1) she belongs to a protected group, (2) she was subject to unwelcome sexual harassment, (3) the harassment was based on gender and (4) her reaction to the harassment complained of affected tangible aspects of the employee's compensation, terms or conditions of employment. *See Henson,* 682 F.2d at 909.

because it requires employers, who themselves have the power to hire and fire supervisory personnel, to be responsible for insuring that those they cloak with apparent authority to affect terms and conditions of their employee's jobs do not abuse that authority. Therefore, it places the burden for preventing quid pro quo sexual harassment on those best situated to prevent it. We also believe this holding is consistent with the legislative mandate that RCW 49.60 be construed liberally to accomplish the purposes of the statute. RCW 49.60.010-.020.

We note that imposing strict liability on employers for quid pro quo sexual harassment is also consistent with general agency law.[6] Under agency law, a principal can be held liable in tort not only for those acts which he or she has expressly or implicitly authorized, but also for those actions in which his or her agent "was aided in accomplishing . . . by the existence of the agency relation". Restatement (Second) of Agency § 219(2)(d), at 481 (1958).[7] The actual or apparent authority invested in supervisory personnel to make employment decisions not only aids in the commission of quid pro

---

[6]*See Vinson*, in which the Supreme Court refused to "issue a definitive rule on employer liability" under Title VII but stated that agency principles should be used as guidance in interpreting the federal statute. In *Vinson*, the court concluded that the definition of "employer" as including any "agent" of an employer suggested Congress intended the courts to look to agency law in interpreting Title VII. 477 U.S. at 72. The definition of "employer" under RCW 49.60 similarly suggests that agency principles are to be referred to in determining the extent of employer liability for sexual harassment. The statute defines "employer" to include "any person acting in the interest of an employer, directly or indirectly". RCW 49.60.040.

[7]This holding is not inconsistent with our recent opinion in *Thompson v. Everett Clinic*, 71 Wn. App. 548, 860 P.2d 1054 (1993), in which we held that an employer is not liable for the tortious conduct of its employees merely because the employment situation has provided the opportunity to commit the tort. In that case we held that a medical employer was not liable for the tortious conduct of a doctor employed at its facility because the acts complained of were not within the scope of his employment. In this case, we hold employers strictly liable for quid pro quo harassment because the employer not only has given a supervisor the opportunity to harass subordinate employees, but has granted the supervisor the necessary authority with which to carry out this type of harassment. In addition, strict liability was not argued in *Thompson*.

quo harassment, it is an essential component of quid pro quo sexual harassment because this type of harassment cannot take place without it.

Our holding is consistent with federal case law on this issue. Every federal circuit court to address this question has held that an employer is strictly liable for quid pro quo harassment perpetrated by its supervisory personnel. *See Sauers v. Salt Lake Cy.*, 1 F.3d 1122 (10th Cir. 1993); *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59 (2d Cir. 1992); *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178 (6th Cir.), *cert. denied*, 113 S. Ct. 831 (1992); *Chamberlin v. 101 Realty, Inc.*, 915 F.2d 777 (1st Cir. 1990); *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311 (11th Cir. 1989); *Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.*, 755 F.2d 599 (7th Cir. 1985); *Crimm v. Missouri Pac. R.R.*, 750 F.2d 703 (8th Cir. 1984); *Katz v. Dole*, 709 F.2d 251 (4th Cir. 1983).

■ Mid-Mac argues in the alternative that there was insufficient evidence to establish that Mid-Mac was an "employer" under RCW 49.60.040. The statute defines an employer to include "any person acting in the interest of an employer, directly or indirectly". Mid-Mac contends that Fares' conduct was so adverse to its interests that it destroyed any agency relationship between them. Mid-Mac's argument is misplaced. The question is not whether Fares was acting within the scope of his authority in harassing Thompson, but rather, whether he was using his apparent or actual authority to make employment decisions as a lever in carrying out the harassment. Mid-Mac gave Fares at least apparent authority to make a number of employment decisions, including determining the hours and schedules of employees, interviewing potential employees, and considering applications for the store's assistant manager position. In exercising this authority, Fares was a "person acting in the interest of an employer" for the purposes of the statute and, as the employer, Mid-Mac is strictly liable for his abuse of that authority.

■ Mid-Mac also argues that the trial court erred in instructing the jury on its liability because there was no quid

pro quo harassment during any period of time in which Mid-Mac had an interest in the business. It contends that all such harassment took place after June 1, 1990, and that after this date it was no longer the owner of Sam's. We reject this argument because there was sufficient evidence at trial to support the trial court's conclusion that the termination agreement between Mid-Mac and Berta did not cut off Mid-Mac's liability. A party has a right to have his or her theory of the case presented to the jury if there is substantial evidence to support it. *Codd v. Stevens Pass, Inc.*, 45 Wn. App. 393, 403, 725 P.2d 1008 (1986), *review denied*, 107 Wn.2d 1020 (1987). Thompson had a right to submit this theory of liability to the jury and the trial court properly instructed the jury accordingly.

## HOSTILE ENVIRONMENT HARASSMENT

The second issue we address is whether the trial court erred in not submitting to the jury the question of Mid-Mac's liability for the hostile work environment created by Fares.

In *Glasgow*, the Supreme Court of Washington addressed the elements of employer liability for hostile work environment harassment. An employee must prove the following elements to establish a hostile work environment claim: the harassment (1) was unwelcome, (2) was based on gender, (3) affected the terms or conditions of employment, and (4) can be imputed to the employer. *Glasgow*, 103 Wn.2d at 407. To impute harassment to an employer under *Glasgow*, an employee must show that the employer "(a) authorized, knew, or should have known of the harassment and (b) failed to take reasonably prompt and adequate corrective action." 103 Wn.2d at 407.

As we noted above, Thompson brought claims against Mid-Mac for both hostile work environment and quid pro quo sexual harassment. The trial court refused to instruct the jury on the hostile work environment theory because it found that there was insufficient evidence that Mid-Mac knew or should have known of Fares' conduct. To establish employer liability for hostile workplace harassment, an employee must show that the employer knew or should have

known about this harassment. *Glasgow*, 103 Wn.2d at 407. Thompson appeals this ruling on the ground that there was sufficient evidence of Mid-Mac's knowledge to submit this claim to the jury.

A trial court's refusal to give a requested instruction is reviewed for abuse of discretion. *Thomas v. Wilfac, Inc.*, 65 Wn. App. 255, 264, 828 P.2d 597, *review denied*, 119 Wn.2d 1020 (1992). A trial court does not abuse its discretion in refusing to give an instruction where there is insufficient evidence to support it. *State v. Hoffman*, 116 Wn.2d 51, 111, 804 P.2d 577 (1991). It is uncontroverted that Thompson never informed Mid-Mac of the harassment she was subject to. In addition, the evidence at trial established that, although a representative of Mid-Mac visited the store on a daily basis, the harassment generally took place when others were not present. Thompson did not introduce any direct evidence establishing Mid-Mac's knowledge of the hostile work environment Fares created. In light of this lack of evidence, the trial court properly refused to instruct the jury on this theory of liability against Mid-Mac.

## NEW TRIAL

Finally, we address the issue of whether the trial court erred in reducing the jury award or, in the alternative, granting Mid-Mac's motion for a new trial. The trial court denied Mid-Mac's motion for a new trial, conditioning its denial on Thompson's acceptance of a reduction in her jury verdict from $278,000 to $25,000, exclusive of attorney fees and costs.[8] The trial court held that, as a matter of law, the damages were "so excessive as unmistakably to indicate that the verdict must have been the result of passion or prejudice." *See* RCW 4.76.030.

A trial court's reduction of a jury verdict or, in the alternative, grant of a new trial pursuant to RCW 4.76.030 is

---

[8]The total amount of the reduced verdict proposed by the trial court was $50,314.52 ($25,000 in damages, $23,222.50 in attorney fees and $2,092.02 in costs). The trial court thus reduced the jury's damage award by approximately 90 percent.

reviewed de novo. *Hendrickson v. Konopaski*, 14 Wn. App. 390, 394-95, 541 P.2d 1001 (1975).[9] In reviewing the trial court's action under RCW 4.76.030, we apply a presumption that "the amount of damages awarded by the verdict of the jury was correct". RCW 4.76.030. The jury verdict must be upheld unless the court finds "from the record that the damages awarded in such verdict by the jury were so excessive . . . as unmistakably to indicate that the amount of the verdict must have been the result of passion or prejudice." RCW 4.76.030.

The jury verdict against Mid-Mac was not so excessive as to warrant the trial court's action. A trial court has no discretion under RCW 4.76.030 to order a remittitur where the jury verdict is within the range of credible evidence. *Hendrickson*, 14 Wn. App. at 395. The jury was presented with sufficient credible evidence to support its verdict. Thompson testified at trial about the harassment she was subjected to, specifically about the terms and conditions of employment that Fares linked to his sexual requests.[10] This testimony

---

[9]Mid-Mac argues that the appropriate standard of review is abuse of discretion. This issue was addressed in *Hendrickson*, where the court distinguished between ordering a new trial under CR 59 and ordering a new trial conditioned upon the refusal to accept a reduced verdict under RCW 4.76.030 and held that de novo review was appropriate for the latter. The court reasoned that de novo review was appropriate under RCW 4.76.030 because ordering a remittitur or an additur presents a far greater invasion of the jury's province than merely granting a new trial. 14 Wn. App. at 395. Mid-Mac further argues that de novo review under RCW 4.76.030 only applies where one party has consented to a remittitur or an additur and the opposite party appeals. Although the statutory language suggests this reading, in *Ma v. Russell*, 71 Wn.2d 657, 430 P.2d 518 (1967), the Supreme Court held that, although the statute does not expressly provide for an appeal by a nonconsenting party adversely affected by the order, the implication is clear that the statute governs such an appeal and that in such cases the court reviews the record de novo. 71 Wn.2d at 659. Furthermore, we note that Mid-Mac's arguments are unavailing because the trial court's order is reversible under either standard of review.

[10]The evidence relevant to Thompson's quid pro quo claim is the reduction of her hours, the offer of an assistant manager's position in exchange for sex and the failure to give an anticipated raise because of her refusal to have sex with Fares. The jury could also properly consider the duration of the harassment and Fares' refusal to stop requesting sexual favors despite her requests that he do so.

was uncontroverted at trial. Additionally, Thompson introduced evidence, through her own testimony and that of her physician, of the emotional and physical impact of Fares' harassment.[11]

If a verdict is supported by substantial evidence, we then determine whether the verdict was animated by passion or prejudice. *James v. Robeck*, 79 Wn.2d 864, 490 P.2d 878 (1971). Before passion or prejudice can justify reduction of a jury verdict, it must be of such manifest clarity that it is unmistakable. *Jacobs v. Calvary Cemetery & Mausoleum*, 53 Wn. App. 45, 49, 765 P.2d 334 (1988), *review denied*, 112 Wn.2d 1015 (1989).

In support of its order, the trial court stated that "[s]exual [h]arassment cases create an environment where the law may appear to allow the jury to punish a defendant", that the damages awarded the plaintiff "far exceed the legitimate damages suffered by" her and that the jury verdicts "represent an extraordinary amount of anger against" the defendants. These "findings" by the trial judge lead us to conclude that he based his ruling on his own opinion of the size of the verdict rather than on evidence in the record.

A jury verdict cannot be overturned merely because of its size. *Snowhill v. Lieurance*, 72 Wn.2d 781, 784, 435 P.2d 624 (1967). Thus, even if the trial court felt the verdict was excessive, it should not have been overturned absent some evidence it was so excessive that it clearly manifests unmistakable passion or prejudice on behalf of the jury. Absent evidence on the record that this was the case, the trial court had no authority to order a new trial conditioned upon Thompson's acceptance or rejection of a reduced jury award. To do so was an abuse of its discretion in this area. Accordingly, we reverse the trial court's order and remand

---

[11]RCW 49.60.030(2) authorizes the recovery of actual damages, including damages for emotional distress and mental anguish. *Delahunty v. Cahoon*, 66 Wn. App. 829, 842, 832 P.2d 1378 (1992). In order to recover on these grounds, the plaintiff does not need to prove outrageous and extreme conduct or severe emotional distress. 66 Wn. App. at 842; *accord Harris v. Forklift Sys., Inc.*, ___ U.S. ___, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993).

with instructions to reinstate the jury verdict.[12] We further grant Thompson's request for attorney fees on appeal pursuant to RCW 49.60.030(2).

GROSSE, J., and FORREST, J. Pro Tem., concur.

Reconsideration denied February 28, 1994.

Review denied at 124 Wn.2d 1028 (1994).

---

[12]Mid-Mac also assigns error to the trial court's judgment holding all three defendants jointly and severally liable for Thompson's attorney fees and costs. Mid-Mac provides no authority or argument for this assignment of error and we do not address it except to note that the award is authorized by RCW 49.60-.030(2) and the trial court committed no error in awarding attorney fees pursuant to the statute.