[No. 17231-3-II.   Division Two.   November 16, 1995.]
SUSAN M. SCHONAUER, *Appellant*, v. DCR
ENTERTAINMENT, INC., *Respondent*.

*Paul A. Lindenmuth* and *Law Offices of Neil J. Hoff*, for appellant.

*Warren E. Martin* and *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim*, for respondent.

MORGAN, J. — In the five weeks between December 11, 1991, and January 12, 1992, Susan Schonauer worked sixteen days as a waitress at Fox's topless nightclub. Fox's is operated by DCR Entertainment. According to Schonau-

er's version of the facts, DCR's shift manager entered the women's dressing room almost every night she worked. On three successive Mondays, DCR's shift manager or his assistant solicited her to participate in DCR's "All Nude Review," a waitress contest staged on Monday nights. Schonauer refused and was soon fired. On appeal from an adverse summary judgment, Schonauer contends the trial court erred by dismissing her claims for sexual discrimination, retaliatory discharge, and outrage. We reverse and remand some claims for further proceedings.

## I

### FACTS

At the times material here, DCR operated a topless nightclub known as Fox's. Apparently, it served coffee and soft drinks, but not alcoholic beverages. It advertised for, and employed, both dancers and waitresses.

Each Monday night, the club held a nude waitress contest.[1] According to DCR, waitresses had the option of participating, but were not required to do so.

On December 9 or 10, 1991, Schonauer, then age nineteen, responded to a DCR advertisement promising "$100 A DAY" for "Beverage Servers." After interviewing with DCR manager Steve Fueston, she was hired as a waitress, not a dancer. According to Schonauer, Fueston promised she could work 7:00 P.M. to 1:00 A.M. She wanted to get off at 1:00 A.M. because she had an infant son and her boyfriend worked days.

Schonauer started work on December 11. She was then told, for the first time, that she would not receive an hourly wage. Rather, she would receive $0.25 for each drink served, plus ninety percent of her tips. As a waitress, she was not required to wear provocative attire; the posted dress code for waitresses merely said: "No T-shirt, no shorts, no sweater."

---

[1]DCR asserts, "[T]he contest [did] not require nudity." Br. of Resp't at 4. Immediately outside the club, however, a large reader board advertised, "All Nude Review—Waitress Contest—Monday 9:00 p.m.—$100.00 prize." We refer to the contest as the sign did.

During the first two weeks, Schonauer worked several 7:00 P.M. to 1:00 A.M. shifts. At some point, she received two hours of on-the-job training as a bartender. She declined to work as a bartender, because she would not have been able to get off at 1:00 A.M.

During the entire time Schonauer worked at the club, according to her, a DCR manager named Kurt Weisert "had a habit of regularly entering into the women's bathroom/locker/dressing room area. He did so about every day that I worked there and was even in there one time when I was sitting in a stall. His presence made me extremely uncomfortable."[2]

By the third week, DCR was scheduling Schonauer to work until the club closed at 4:00 A.M. She complied but continued to request 7:00 P.M. to 1:00 A.M. shifts. According to her, she reported at least twenty minutes before each shift started, and called in sick only once. She was not rude to customers or other employees, and she was not reprimanded "except for refusing to dance in the waitress contest."[3]

Schonauer's difficulties began on Monday, December 23, 1991, when DCR's shift manager, Weisert, handed her a white information card and asked her to participate in that night's nude waitress contest. Schonauer "immediately understood that he wanted [her] to dance on stage nude as part of the contest."[4] The white card "asked several questions about [her] sexual preferences, like '. . . what is [her] sexual fantasy preference, . . . with how many men, . . . where . . . '. It had a place to pick 'a stage name', [her] age and other information."[5] Apparently, DCR wanted to broadcast this information to the audience during the contest.

As Weisert attempted to convince Schonauer to partici-

---

[2]Clerk's Papers at 109-10.

[3]Clerk's Papers at 108.

[4]Clerk's Papers at 109.

[5]Clerk's Papers at 109.

pate in the contest, he put his arm around her and said, "I really need you to do the contest."[6] When she refused, saying she had not been hired as a dancer, Weisert "walked away in a huff."[7] Several other waitresses then asked for advice on how to deal with Weisert, and she replied, "[J]ust say 'no.' "[8] No contest was held that night, because DCR could not persuade enough waitresses to participate. According to Schonauer, Weisert glared at her in an intimidating manner for the rest of the night, and she responded by trying to avoid him.

The next Monday, December 30, a DCR employee named Les gathered Schonauer and other waitresses near the bar. He said, "You're all going to do the contest tonight."[9] Schonauer said, "No." Undeterred, Les passed out white information cards and said, "You all do it for Kurt."[10] Schonauer and others reiterated, "No we don't."[11] Les walked away, but soon returned to proclaim, "I've got no white cards back."[12] No contest was held that night, and when Weisert arrived at the club later in the shift, Schonauer perceived him to be glaring at her.

On the third Monday, January 6, 1992, Weisert handed Schonauer a white information card and said, "I really need you to do the contest."[13] Schonauer refused and left the card on a counter. A few minutes later, Weisert handed her another card and said in a commanding voice, "You're doing the contest."[14] Schonauer again refused, put the card down, and avoided Weisert the rest of the eve-

---

[6]Clerk's Papers at 109.

[7]Clerk's Papers at 109.

[8]Clerk's Papers at 109.

[9]Clerk's Papers at 110.

[10]Clerk's Papers at 110.

[11]Clerk's Papers at 110.

[12]Clerk's Papers at 110.

[13]Clerk's Papers at 110.

[14]Clerk's Papers at 110.

ning. The nude waitress contest went forward, with the participants either stripping or flashing their lingerie.

On Sunday, January 12, Weisert fired Schonauer, saying only that she was no longer needed. DCR continued to advertise for waitresses and dancers.

A day or two later, Schonauer phoned Steve Fueston to ask why she had been fired. Fueston said he would talk to Weisert and call her back. According to her, however, it was she who called him back, and in that second phone call he said Weisert had fired her because she would not bartend and would not participate in the waitress contest.

After Schonauer had spoken with Fueston, her boyfriend, Glenn Kelley, phoned Weisert and tape recorded the following conversation without Weisert's knowledge or consent:

Kelley: Yea, I'm curious how come you don't want her working with you, there no more

Weisert: I have explained that to her

Kelley: Yes, well Steve [Fueston]

Weisert: Several occasions, and I think Steve just explained that to her

Kelley: Yes, he said it was because she wouldn't dance for you

Weisert: That's not what he said. I was sitting right there.

Kelley: He said because she wouldn't do things that you wanted, like bartend and dance. Steve said part of it was because she wouldn't dance and do the contest. And that's dancing.

Weisert: And inflexibility of her schedule.[15]

In May 1992, Schonauer sued, claiming sexual harassment, sexual discrimination, retaliatory discharge, outrage, failure to comply with Washington's minimum wage statute, and failure to comply with the federal Fair

---

[15]Clerk's Papers at 103.

Labor Standards Act. The last two claims were dismissed by stipulation of the parties, after DCR settled with the Washington State Department of Labor and Industries.

DCR moved for summary judgment on the remaining claims, and each party submitted affidavits and declarations. Schonauer's affidavit set forth the facts stated above. It also acknowledged that her deposition had previously been taken and that she had not, at that time, remembered the second phone call to Fueston. Later, she refreshed her memory by reviewing a transcript of the Kelly-Weisert phone call.

For its part, DCR filed a declaration from Weisert stating that Schonauer had been terminated "based on [her] inability to report for shifts as scheduled, her curt and rude interactions with bartenders, other beverage servers, management, and customers, and other deficiencies in her performance, including spending a lot of time visiting with other persons at the club."[16] Weisert denied pressuring or forcing any waitress to participate in the nude waitress contest.

DCR also filed declarations from waitresses Chari Kamenzind and Aloha Anderson. They generally supported Weisert's claims. They also stated that they had refused to participate in the waitress contest, that their refusals had not resulted in retaliation, and that Schonauer had "frequently" or "routinely" been late for work.

The trial court granted summary judgment in favor of DCR. It also ruled that the Kelley-Weisert phone conversation had been illegally recorded, and thus was inadmissible. Schonauer then filed this appeal.

■ We engage in the same analysis as the trial court. *Margola Assocs. v. City of Seattle*, 121 Wn.2d 625, 634, 854 P.2d 23 (1993). We can uphold the trial court's grant of summary judgment only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We must take the facts

---

[16]Clerk's Papers at 49-50.

and reasonable inferences therefrom in the light most favorable to the nonmoving party, Schonauer. *Hansen v. Friend*, 118 Wn.2d 476, 485, 824 P.2d 483 (1992).

## II

### EVIDENTIAL ISSUES

The parties raise two evidential issues. One involves Schonauer's alleged second phone call to Fueston. The other involves Kelley's call to Weisert.

### A. Second Phone Call to Fueston

DCR contends that Schonauer's second call to Fueston cannot be considered in these summary judgment proceedings. Its premise is that Schonauer, in her deposition, "testified that she had only had one conversation with Steve Fueston after her employment was terminated."[17] This premise, however, is not supported by the record. Schonauer discusses her first call to Fueston on page 52 of her deposition. She discusses Kelley's call to Weisert on page 54 of her deposition. She says in her affidavit that she made the second call to Fueston before Kelley made his call to Weisert. The record omits page 53 of her deposition, and we have no way of knowing whether she did or did not discuss the second call to Fueston on that page.

Even if DCR's premise were supported by the record, its argument would still fail. DCR relies on *Marshall v. AC&S, Inc.*, 56 Wn. App. 181, 185, 782 P.2d 1107 (1989),[18] for the proposition that statements in a party's affidavit are inadmissible (i.e., may not be considered by the court) if the affidavit is inconsistent with an earlier deposition and fails to explain the inconsistency. *Marshall*, however, does not stand for that proposition.

■ To say evidence is admissible is to say it may be

---

[17]Br. of Resp't at 47.

[18]DCR also relies on *Foster v. Arcata Assoc., Inc.*, 772 F.2d 1453, 1462-63 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048 (1986). That case is consistent with *Marshall*, and we do not discuss it separately.

considered. To say evidence is sufficient is to say, after considering it, that it is capable of raising an issue of fact for the jury. The *Marshall* court considered the plaintiff's affidavit in light of the other evidence in the case, *Marshall*, 56 Wn. App. at 184-85, before concluding (1) that the affidavit was inconsistent with plaintiff's earlier deposition testimony, (2) was offered without explaining the inconsistency, and thus (3) was insufficient to raise a reasonable inference supporting plaintiff's position. The *Marshall* court was dealing with sufficiency, not admissibility, and its holding fails to support DCR's present argument.

Here, Schonauer asserts in a properly sworn affidavit that she has personal knowledge of a second phone call to Fueston. CR 56 does not require more before evidence is "admissible" in a summary judgment proceeding. Thus, we consider her assertion in the light most favorable to her, and, as in *Marshall*, in light of the entire record before the court.

### B. Kelley's Recording of the Phone Call to Weisert

■ Schonauer contends the trial court erred by excluding the tape recorded phone conversation between Kelley and Weisert.[19] The trial court based its ruling on RCW 9.73.030 and RCW 9.73.050. RCW 9.73.030 provides in pertinent part:

> (1) Except as otherwise provided in this chapter, it shall be unlawful for any individual . . . to intercept, or record any:
>
> (a) Private communication transmitted by telephone . . . without first obtaining the consent of all the participants in the communication;
>
> (b) Private conversation, by any device . . . designed to record or transmit such conversation . . . without first obtaining the consent of all the persons engaged in the conversation.

---

[19]DCR also seems to claim that Schonauer's second call to Fueston was illegally recorded by Kelley. Br. of Resp't at 49 n.9. We do not discuss that claim because nothing in the record supports it.

RCW 9.73.050 provides in pertinent part:

> Any information obtained in violation of RCW 9.73.030 . . . shall be inadmissible in any civil or criminal case in all courts of general or limited jurisdiction in this state . . . .

When RCW 9.73.050 applies, it bars the perceptions of those who made the recording, as well as the recording itself. *State v. Salinas*, 121 Wn.2d 689, 693, 853 P.2d 439 (1993); *State v. Fjermestad*, 114 Wn.2d 828, 836, 791 P.2d 897 (1990); *State v. Williams*, 94 Wn.2d 531, 543, 617 P.2d 1012 (1980).

Despite Schonauer's arguments to the contrary, it is clear that Kelley's call to Weisert involved a private conversation within the meaning of these statutes. It is also clear that Kelley tape recorded the conversation without Weisert's knowledge or consent. The trial court did not err by excluding all evidence pertaining to that conversation.[20]

## III

### SEXUAL DISCRIMINATION

RCW 49.60.180(2), (3) provides that it is an unfair practice for any employer to discharge or otherwise "discriminate against any person in compensation or in other terms or conditions of employment because of . . . sex . . . ." It makes actionable hostile work environment sexual harassment and quid pro quo sexual harassment. *Glasgow v. Georgia-Pacific Corp.*, 103 Wn.2d 401, 405, 693 P.2d 708 (1985); *Thompson v. Berta Enters.*, 72 Wn. App. 531, 535-36, 864 P.2d 983, *review denied*, 124 Wn.2d 1028 (1994). Even where sexual harassment is not involved, it makes actionable disparate treatment based on gender. *See, e.g.,*

---

[20]In making this statement, we do not mean that Schonauer cannot testify about her second phone call to Fueston because she refreshed her memory using a transcript of the Kelley-Weisert phone call. Properly refreshed, personal knowledge testimony about the Schonauer-Fueston phone call represents evidence of that call, and not evidence of the Kelley-Weisert phone call. *See* ER 612.

*Mackay v. Acorn Custom Cabinetry, Inc.*, 127 Wn.2d 302, 310, 898 P.2d 284 (1995). According to Schonauer, all three forms of discrimination are involved here.

## A. Hostile Work Environment

■ To establish a claim for hostile work environment sexual harassment, an employee must initially identify and prove the conduct complained of.[21] *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 61, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986) (parties disputed whether conduct occurred). Then, the employee must prove four elements, plus damages. *See Delahunty v. Cahoon*, 66 Wn. App. 829, 836, 832 P.2d 1378 (1992) (citing *Glasgow*, 103 Wn.2d at 406-07).

First, the employee must prove the conduct was unwelcome. Conduct is unwelcome if the employee does not solicit or incite it, and regards it as undesirable or offensive.[22] *Glasgow*, 103 Wn.2d at 406.

Second, the employee must prove the conduct was because of sex. Conduct is because of sex if it would not have occurred had the employee been of a different sex. *Glasgow*, 103 Wn.2d at 406.

Third, the employee must prove the conduct affected his or her terms or conditions of employment. Conduct affects the terms or conditions of employment if it is "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Glasgow*, 103 Wn.2d at 406; *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295, 301 (1993); *Meritor Sav. Bank*, 477 U.S. at 67. Whether conduct rises to this level depends on the totality of the circumstances, *Glas-*

---

[21]The employee must also prove membership in a protected class. *See, e.g. Thompson*, 72 Wn. App. at 537 n.5. In a sexual discrimination case, however, this means only that the employee must show his or her gender. Thus, this requirement is automatically met. *Nichols v. Frank*, 42 F.3d.503, 511 (9th Cir. 1994) (discussing quid pro quo harassment; two of three judges concur in result only).

[22]This is different from asking whether the employee submitted to the conduct voluntarily. *See Meritor Sav. Bank*, 477 U.S. at 68.

*gow*, 103 Wn.2d at 406-07, "includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 114 S. Ct. at 371.

Fourth, the employee must prove that the conduct is imputable to the employer. Conduct is imputable to the employer if it is the conduct of an owner, manager, partner, or corporate officer, or, alternatively, if it is the conduct of a supervisor which the employer authorized, knew of, or should have known of, and the employer "failed to take reasonably prompt and adequate corrective action." *Glasgow*, 103 Wn.2d at 407.

■ The employee who proves these elements is entitled to actual damages. RCW 49.60.030(2). Such damages include compensation for emotional distress and mental anguish. *Glasgow*, 103 Wn.2d at 407 ("damages for physical, emotional and mental suffering"); *Thompson*, 72 Wn. App. at 543 n.11; *Delahunty*, 66 Wn. App. at 842; *see Harris*, 114 S. Ct. at 367 (construing federal law). If the employer fired the employee, such damages also include an appropriate measure of back pay, provided that the employee's response to the sexual harassment was a substantial factor in the employer's decision to fire.[23] *See Mackay*, 127 Wn.2d at 310 (disparate treatment based on gender intertwined with hostile work environment sexual harassment); *Allison v. Housing Auth.*, 118 Wn.2d 79, 96, 821 P.2d 34 (1991) (retaliatory discharge).

Here, Schonauer was hired as a waitress, not a dancer. From the beginning, according to her, she refused DCR's requests to provide sexually explicit information and to

---

[23]To the extent Schonauer claims damages for being fired, her claim can be labelled either "sexual harassment" or "retaliatory discharge." Under either label, the core of her claim is an assertion that she was fired because she opposed sexual harassment. When the label "retaliatory discharge" is applied, she must prove that her opposition to a practice forbidden by RCW 49.60 (i.e., sexual harassment) was a substantial factor in the employer's decision to fire. RCW 49.60.210; *Allison v. Housing Auth.*, 118 Wn.2d 79, 96, 821 P.2d 34 (1991). When the label "sexual harassment" is applied, she must prove likewise.

dance on stage in a sexually provocative way. Despite her refusals, Weisert and Les repeatedly pressured her. Adding further insult, Weisert routinely entered the women's dressing room while Schonauer was present.

Viewing the evidence and inferences in the light most favorable to Schonauer, a jury could reasonably infer that Weisert's and Les' conduct was unwelcome. Schonauer repeatedly rejected it, and she tried to avoid its perpetrators.

A jury could reasonably infer that Weisert's and Les' conduct was because of sex. Obviously, they approached Schonauer because she is female.

A jury could reasonably infer that Weisert's and Les' conduct created a hostile and offensive work environment. According to her, she wished only to wait tables and collect her $0.25 per drink plus tips. She made her wishes plainly known. Weisert and Les nonetheless pressured her, repeatedly and intentionally, to provide fantasized sexual information[24] and to dance on stage in sexually provocative ways. Whether or not this would have created a hostile working environment for someone hired to dance nude on stage—an issue we need not address—it arguably created a hostile working environment for someone hired to wait tables, and the hostile and offensive nature of that environment was arguably intensified by Weisert's intrusions into the women's dressing room and bathroom.[25]

Finally, a jury could impute Weisert's and Les' conduct

---

[24]DCR contends that this information "was expected to be entirely fictitious." Br. of Resp't at 24 n.4. As a result, it says, the conduct in seeking it cannot constitute sexual harassment. We disagree.

[25]DCR suggests that Schonauer invited whatever problems she had because she "hired on" knowing the nature of its adult-oriented business. Br. of Resp't at 26 n.5. In asserting that DCR created a hostile work environment, however, Schonauer does not rely on whatever atmosphere might generally prevail in a topless nightclub. Rather, she relies on the nature of her particular job as a waitress, and on specific conduct directed at her by Weisert and Les. Thus, we reject this argument.

DCR also argues that the affidavits of Kamenzind and Anderson provide "undisputed evidence" that waitresses who chose not to enter the nude waitress contest were not subject to firing or other job-related detriment. These affidavits

to DCR. In an affidavit submitted by Weisert, he states he was a manager of the club, and it is reasonably inferable that he authorized and knew of Les' actions. We conclude that Schonauer has come forward with evidence sufficient to prove that DCR is liable for hostile work environment sexual harassment.

## B. Quid Pro Quo

██ ██ To establish quid pro quo sexual harassment, an employee must prove that the actor sought "sexual consideration" in exchange for a job benefit or the absence of a job detriment. *Glasgow*, 103 Wn.2d at 405; *Thompson*, 72 Wn. App. at 536, 537 n.5; *Nichols v. Frank*, 42 F.3d 503, 511 (9th Cir. 1994).[26] In contrast to hostile work environment harassment, the actor's conduct need not be pervasive, and one incident may be enough to support a cause of action. *Keppler v. Hinsdale Township High Sch. Dist. 86*, 715 F. Supp. 862, 867 (N.D. Ill. 1989).

Additionally, an employee must prove that the conduct was unwelcome and based on gender.[27] It appears these elements are met in the same way as with hostile work environment sexual harassment.

---

raise issues of fact when compared with Schonauer's affidavit. Thus, they do not warrant resolution of the case as a matter of law.

[26]*Thompson* stated in a footnote that an employee's reaction to sexual harassment must have affected the "tangible aspects" of the employment. *Thompson*, 72 Wn. App. at 537 n.5. It relied on *Henson v. Dundee*, 682 F.2d 897, 909, a 1982 Eleventh Circuit case. *Henson*, however, was decided at a time when federal law limited damages for discrimination to tangibles like back pay. Federal law no longer contains that limitation, 42 U.S.C. § 2000e-5(g); 42 U.S.C. § 1981a; *Landgraf v. USI Film Prods.*, 511 U.S. 244, 114 S. Ct. 1483, 1506-08, 128 L. Ed. 2d 229 (1994), and Washington law never did. RCW 49.60.030(2); *Glasgow*, 103 Wn.2d at 407. Additionally, the Ninth Circuit has declined to adopt *Henson's* multi-element test, stating it is "unnecessarily complicated and overly formalistic." *Nichols v. Frank*, 42 F.3d 503, 511 (9th Cir. 1994) (two judges concurring in result only). The Ninth Circuit has held "that quid pro quo sexual harassment occurs whenever an individual explicitly or implicitly conditions a job, a job benefit, or the absence of a job detriment, upon an employee's acceptance of sexual conduct." *Nichols*, 42 F.3d at 511.

[27]As before, the employee must also prove membership in a protected class. *Thompson*, 72 Wn. App. 537 n.5. In a sexual discrimination case, however, this means only that the employee must show his or her gender. *Nichols v. Frank*, 42 F.3d 503, 511 (9th Cir. 1994).

Finally, the employee must attribute the actor's conduct to the employer. Division One has held that an employer is strictly liable for quid pro quo harassment perpetrated by its supervisory personnel. *Thompson*, 72 Wn. App. at 536. So has every federal circuit that has considered the issue, *see Thompson*, 72 Wn. App. at 539, apparently including the Ninth. *Nichols*, 42 F.3d at 508-09, 513-14 (two judges concurring in result only). We follow these other courts.

■ Once an employee has proved these elements, he or she is entitled to actual damages, including damages for emotional distress. RCW 49.60.030(2); *see Glasgow*, 103 Wn.2d at 407 (relying on RCW 49.60.030(2)). If the employee was fired, damages include an appropriate measure of back pay, provided the sexual harassment was a substantial factor in the employer's decision to fire. *See Mackay*, 127 Wn.2d at 310 (intertwining hostile work environment sexual harassment and disparate treatment based on gender); *Allison*, 118 Wn.2d at 96 (retaliatory discharge).

■ Turning to this case, a jury could reasonably infer that Weisert and Les were seeking sexual consideration when they demanded that Schonauer provide sexually explicit information and display herself on stage in sexually provocative ways. The case is unusual, of course, in that Weisert and Les were not seeking sexual consideration for the purpose of gratifying their personal desires; rather, they were seeking sexual consideration for the purpose of gratifying DCR's customers. We think, however, that when sexual conduct is directed by an employer at an employee for the purpose of gratifying third parties, it puts the employee in the same untenable position—and thus is no less threatening, intimidating and humiliating—than when it is directed at the employee for the purpose of gratifying the employer personally. Thus, it is our view that one who seeks sexual consideration for the gratification of third persons is accountable to the same extent as one who seeks sexual consideration for personal gratification.

A jury could reasonably infer that Weisert's and Les' conduct was unwelcome. Schonauer had been hired as a waitress, not a dancer; and in refusing Weisert's and Les' demands that she display herself on stage, she repeatedly said, in effect, that she just wanted to do her waitress job free of their harassment.

A jury could reasonably infer that Weisert's and Les' conduct was based on gender. Obviously, it would not have occurred as it did but for Schonauer being female.

A jury could reasonably infer that Weisert was conditioning a job benefit or the absence of a job detriment on Schonauer's acceptance of his and Les' demands for sexual consideration, and that Schonauer's rejection of such demands was a substantial factor in Weisert's decision to terminate her employment. Personally and through Les, Weisert persistently demanded that Schonauer participate in the waitress contest. He reacted angrily when she refused. He fired her within a week of her third refusal and within three weeks of her first refusal. Shortly after she was fired, Fueston, another manager, said she had been fired in part because she would not participate in the nude waitress contest. According to Schonauer, there was no other reason she might have been fired; she had reported for work at least twenty minutes before each shift started, had called in sick only once, had not been rude to customers or other employees, and had not been reprimanded.

A jury could reasonably infer that Weisert's conduct should be attributed to DCR. It is undisputed that Weisert was a manager, and it is reasonably inferable that he authorized and knew of Les' conduct. We conclude that Schonauer has produced evidence which, taken in the light most favorable to Schonauer, is sufficient to prove DCR liable for quid pro quo sexual harassment.

## C. Disparate Treatment Discrimination

Even when sexual harassment is not present, sexual discrimination can be proven by showing disparate

treatment of males and females. When such a claim is brought by a woman against her employer, she must show, in essence, that the employer treated her differently from similarly situated men. *Ellingson v. Spokane Mortgage Co.*, 19 Wn. App. 48, 54, 573 P.2d 389 (1978). She can establish a prima facie case by showing that she (1) is a member of a protected group (i.e., is a woman), (2) was discharged, (3) was replaced by a person outside the protected group (i.e., by a man), and (4) was qualified to do the job. *Kastanis v. Educational Employees Credit Union*, 122 Wn.2d 483, 490, 859 P.2d 26 (1993), 865 P.2d 507 (1994). Her ultimate burden, however, is to show that gender was a "substantial factor" in the employer's adverse employment decision. *Mackay*, 127 Wn.2d at 310.

For at least two reasons, Schonauer cannot prove a claim for disparate treatment. First, she cannot show that she was replaced by a male waiter, or even that DCR had any male waiters. Thus, there is no way for a jury to compare her situation with that of similarly situated men. Second, even if DCR had had male waiters, the record contains nothing to suggest that DCR would have treated them any better than it treated her. Suppose, for example, that DCR had had a Monday night dance contest for male waiters, and that a particular male waiter had refused to participate. Does anything in this record suggest that he would not have joined her in the ranks of the unemployed? The answer is no. Although this record supports a cause of action for work environment sexual harassment and for quid pro quo sexual harassment, it does not support a cause of action for disparate treatment based on gender.

## III

### RETALIATORY DISCHARGE

Schonauer asserts two bases for retaliatory discharge. The first is RCW 49.60.210. The second is "public policy."

### A

RCW 49.60.210(1) provides:

> It is an unfair practice for any employer . . . to discharge . . . or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter, or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter.

A discharge will support an award of damages when (1) the employee engaged in a statutorily protected activity, (2) an adverse employment action was taken, and (3) the statutorily protected activity was a substantial factor in the employer's adverse employment decision. *Allison*, 118 Wn.2d at 96; *Delahunty*, 66 Wn. App. at 839.

 As stated above, the record here supports reasonable inferences that Schonauer opposed sexual harassment, a statutorily protected activity. It also supports inferences that she was fired by DCR, and that her activity was a substantial factor in DCR's decision. Accordingly, she is entitled to rely on RCW 49.60.210.[28]

## B

 Schonauer argues she was discharged in violation of other public policies not embodied in RCW 49.60. We find her arguments unpersuasive, for "courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject." *Dicomes v. State*, 113 Wn.2d 612, 617, 782 P.2d 1002 (1989) (quoting *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984)). We hold that she is not entitled to recover for retaliatory discharge unless she proves a violation of RCW 49.60.210(1).

## IV

### OUTRAGE

 Schonauer's final claim is that DCR's conduct

---

[28]If a jury trial is held on remand, the instructions must be drafted to avoid duplication of damages. As observed in an earlier footnote, Schonauer claims damages due to being fired under two different labels: retaliatory discharge and sexual harassment.

constituted the tort of outrage. That tort is established when the defendant's conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975). Conduct does not meet this test if it amounts to mere insults and indignities that cause embarrassment or humiliation. *Dicomes*, 113 Wn.2d at 630. Nor does it meet this test if it involves no more than the firing of an employee in private. *Id.*

Here, DCR's prefiring conduct amounted to insults and indignities. It is actionable as sexual harassment, for reasons already explained, but it is not actionable under the tort of outrage. Likewise, when DCR fired Schonauer, it did so in private, without aggravating circumstances (except those pertaining to sexual harassment). Although the firing may be compensable as an item of damage related to sexual harassment, it is not compensable under the tort of outrage.

We reverse the trial court's dismissal of Schonauer's claims based on hostile work environment sexual harassment, quid pro quo sexual harassment, and retaliatory discharge in violation of RCW 49.60.210(1). We remand those claims to the superior court for further proceedings consistent with this opinion. In all other respects, the superior court's judgment is affirmed.

HOUGHTON, A.C.J., and BRIDGEWATER, J., concur.

Reconsideration denied December 1, 1995.

Review denied at 129 Wn.2d 1014 (1996).