[No. 42543-9-I. Division One. October 3, 2000.]

CHRISTA HENNINGSEN, *Respondent*, v. WORLDCOM, INC., *Appellant*.

---

[117] 123 Wn.2d 260, 281, 868 P.2d 134 (1994).

*Frederick T. Rasmussen* (of *Stokes, Eitelbach & Lawrence, P.S.*); and *Ann M. Logerfo* (*Mark Kobata* of *Barlow Kobata & Denis*, of counsel), for appellant.

*Andrea Brenneke, Katrin E. Frank*, and *Timothy K. Ford* (of *MacDonald Hoague & Bayless*), for respondent.

KENNEDY, J. — Following a bench trial in this sex discrimination case, the trial court entered a judgment against WorldCom, Inc., awarding Christa Henningsen $415,224.73 in damages, based on its finding that her direct supervisor, Rob Green, a manager of WorldCom, subjected Henningsen to a hostile work environment and quid pro quo sexual harassment, and based on its conclusion that WorldCom was vicariously liable for the discrimination. The trial court also awarded Henningsen $186,010.94 in attorney fees, costs and expenses, using a multiplier of 1.25 for the attorney fee award. WorldCom appeals, contending that the trial court erred in imputing liability for Green's conduct to the employer because (1) the quid pro quo harassment claim was barred by the statute of limitations; (2) Green was not a "manager" within the meaning of *Glasgow v. Georgia-Pacific Corp.*, 103 Wn.2d 401, 693 P.2d 708 (1985) so that liability could not be automatically imputed for the hostile work environment claim; (3) Henningsen failed to mitigate her damages, so that full back pay should not have been awarded; and (4) the trial court's use of a 1.25 multiplier on the hours expended to enhance the attorney fee award was not justified.

*Glasgow* is not controlling of the vicarious liability issue with respect to the hostile work environment claim. Even if

Green was only a supervisor within the meaning of *Glasgow*, recognized agency principles support the imputation of liability for this claim. The statute of limitations does not bar Henningsen's quid pro quo harassment claim, so that automatic vicarious liability was appropriate, in any event. WorldCom failed to satisfy its burden of proving that Henningsen failed to mitigate her damages. Accordingly, we affirm the judgment for damages. But the trial court failed to enter findings of fact and conclusions of law supporting the attorney fee award and, in particular, explaining the basis for applying the multiplier. Accordingly, we reverse and remand on that issue, with instructions that the trial court enter findings and conclusions sufficient to permit review of the fee award and the multiplier. Henningsen having substantially prevailed in this appeal, she is entitled to an award of attorney fees and costs on appeal.

## FACTS

In September 1990, WorldCom, Inc., a long distance telecommunications company formerly known as Metromedia and then LDDS, hired Christa Henningsen in its Seattle office as a sales office administrator. At the time, Rob Green was a District Sales Manager and directly supervised Henningsen. As Henningsen's supervisor, Green evaluated Henningsen's performance in her sales office administrator position and had the authority to initiate discipline and termination proceedings. He also had the authority to grant Henningsen a promotion from sales office administrator to sales representative.

In late 1991 and early 1992, Henningsen repeatedly told Green that she wanted to be considered for a sales representative position. Green told Henningsen that he did not think women could handle the inevitable rejection associated with "cold calling" and refused to take her seriously. In May 1992, on the same day that Henningsen reiterated her interest in a sales position, Green told Henningsen that he was sexually attracted to her. Later that day, Green kissed

Henningsen. While both were working late a couple of weeks later, Green invited Henningsen into his office and kissed her again. Feeling panicky and powerless, Henningsen submitted to sexual relations with Green.

Following this sexual encounter, Henningsen informed Green that she did not want a sexual relationship with him and that she wanted him to treat her in a professional manner. Green stated his agreement. Shortly thereafter, Henningsen informed Green that she would quit if she were not given a sales representative position. For the first time, Green took Henningsen seriously and scheduled her for an interview. During the interview, Green proposed that they have sexual relations. Henningsen expressed her disapproval, and Green said that he was only kidding.

Although his supervisor expressed doubts, Green gave Henningsen the sales position that she sought. She started the position in September 1992 and was an immediate success. Despite Henningsen's requests that their relationship remain professional, Green continued to make periodic sexual advances and comments to Henningsen, and occasionally would kiss her. Green told Henningsen that she got the sales position thanks to him, and that she "owed" him. In addition, Green intermittently directed angry outbursts at Henningsen. Most of the time, Henningsen would walk away or tell Green that he was making her feel uncomfortable. On one occasion in March 1993, scared and feeling powerless, Henningsen again had sexual relations with Green, in a co-worker's office.

In April 1993, Green received a promotion. Although no longer Henningsen's direct supervisor, Green continued to have regular supervisory contact with Henningsen, and retained his authority to initiate discipline and termination proceedings against her. Green continued to tell Henningsen that she owed him, and continued making sexual overtures to her. In October 1993, Green appeared at Henningsen's apartment and told her that he wanted to have sexual relations. Henningsen said no, but Green persisted. In a confused daze, Henningsen had sexual relations with Green for a final time.

Later in October 1993, Henningsen's medical doctor referred her to a psychotherapist. According to her psychotherapist, Henningsen sought help because "she was being harassed at work by Rob Green." After seeing Henningsen for six months, the psychotherapist testified that she was struck by how afraid Henningsen was for her safety and the possibility of losing her sales position.

In 1994, Green was promoted to Regional Director of Sales, Northwest Region, and his interaction with Henningsen became less frequent. Green, however, continued to make sexual overtures to Henningsen. During one such conversation, Green said, "I really enjoyed having sex with you," and "You owe me for getting you your job." Other times, he would come up behind her, announce that he was going to remove some lint from her clothing, and pinch her on the buttocks. Green's erratic behavior of treating Henningsen very well at one moment and then terribly the next also continued.

In the fall of 1994, Henningsen's work began to suffer. In October 1994, her sales fell below her quota. In November 1994, WorldCom terminated Green's employment for reasons unrelated to Henningsen. Still unable to achieve her sales quota, Henningsen took disability leave in January 1995. In July 1995, after Henningsen had exhausted all her disability leave, WorldCom terminated her employment.

Throughout her employment with WorldCom, Henningsen never reported the sexual harassment to WorldCom's Human Resources Department, which was the company's designated place for reporting employment discrimination. She did, however, complain to Andrea Swanson, the Manager of Account Relations for the Northwest Region, and to Mike Pirello, the Seattle Branch Manager. The evidence reflects that Henningsen told Swanson about the sexual nature of her employment difficulties with Rob Green but that she complained only about the verbal abuse to Pirello. Swanson believed Henningsen was telling the truth, and was aware that sexual harass-

ment was supposed to be reported to the Human Resources Department, but Swanson had not yet had sexual harassment training and apparently did not understand that the problem Henningsen described to her constituted sexual harassment. Thus, Swanson did not report the matter to Human Resources. Pirello apparently believed that the problem was between Green and Henningsen, and Pirello did not wish to get involved; essentially, he brushed Henningsen's complaints aside. Although there is no evidence that management personnel higher in the company than Andrea Swanson were told of the sexual nature of Green's harassment of Henningsen, there is evidence in the record that Green's verbal abuse of the sales force was well known to higher management; nevertheless, Green continued to receive promotions until his position was eventually eliminated in a corporate restructuring.

On September 30, 1996, Henningsen filed a sexual harassment lawsuit against WorldCom. A bench trial was held. On March 10, 1998, the trial court rendered a verdict for Henningsen. In its findings of fact and conclusions of law, the trial court ruled that WorldCom was liable for the hostile work environment created by Green and for Green's quid pro quo sexual harassment of Henningsen. In so ruling the court found Green to be a manager in name and function and concluded that imputation of liability was proper under *Glasgow* with respect to the hostile work environment claim. The trial court awarded Henningsen $282,179.73 in back pay damages through trial, $8,045 in past and future medical damages, and $125,000 in noneconomic damages. The trial court also awarded Henningsen $186,010.94 in attorney fees, costs, and expenses. WorldCom appeals.

## DISCUSSION

Sexual harassment claims have frequently been categorized as either "hostile work environment" or "quid pro quo harassment" in both state and federal courts. *E.g., DeWater*

*v. State*, 130 Wn.2d 128, 134, 921 P.2d 1059 (1996) (citing *Payne v. Children's Home Soc'y*, 77 Wn. App. 507, 511 n.2, 892 P.2d 1102 (1995)); *Davis v. City of Sioux City*, 115 F.3d 1365, 1367 (8th Cir. 1997). These categories gained significance as various federal courts, in the effort to analyze vicarious liability of employers for employee discrimination using agency principles (as directed by the United States Supreme Court in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)) ruled that where the plaintiff establishes quid pro quo harassment, the employer is subject to vicarious liability, rather than liability limited to its own negligence in failing to stop discrimination when it knew or should have known that employees were being subjected to a hostile work environment based on sex discrimination. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752-53, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) (discussing the history and evolution of the significance of the "quid pro quo harassment" and "hostile work environment" with respect to employer liability under Title VII).

In the typical hostile work environment case, an employee seeks damages from an employer for being subjected to unwelcome sexual harassment at work that "affected the terms or conditions of employment[.]" *DeWater*, 130 Wn.2d at 135. In the typical quid pro quo harassment case, an employee seeks damages from an employer for a supervisor or employer's extortion or attempted extortion of sexual favors in exchange for a job benefit or the absence of a job detriment. *Id.*; *Schonauer v. DCR Entertainment, Inc.*, 79 Wn. App. 808, 823, 905 P.2d 392 (1995).

I. Employer Liability in Hostile Work Environment Cases

Although "[a]n employer is strictly liable for quid pro quo harassment perpetrated by supervisory personnel who have actual or apparent authority to make employment decisions on behalf of the employer[,]" a plaintiff

asserting a hostile work environment claim against an employer must demonstrate some specific basis for imputing liability to the employer for the conduct of its employees. *DeWater*, 130 Wn.2d at 135. The Washington Supreme Court has heretofore recognized two bases upon which employees can impute liability on their employers for hostile work environments: (1) If "an owner, manager, partner or corporate officer personally participate[d]" in creating the hostile work environment, the employer is automatically liable. *Glasgow v. Georgia-Pacific Corp.*, 103 Wn.2d 401, 407, 693 P.2d 708 (1985); (2) If the plaintiff's supervisor(s) or co-worker(s) created the hostile work environment, "the employee must show that the employer (a) authorized, knew, or should have known of the harassment and (b) failed to take reasonably prompt and adequate corrective action." *Id.*

Although WorldCom concedes that Green was a low- to mid-level manager, WorldCom contends that the *Glasgow* court's "use of the term 'manager' with the surrounding terms of 'owner,' 'partner' and 'corporate officer' indicates that for there to be automatic liability, the manager would need to be at a corporate level akin to that of the business owner or an actual officer of the company." Appellant's Br. at 12. Therefore, WorldCom contends that the trial court erred in ruling that it was automatically liable for the hostile work environment created by Green, because Green should be treated as a "supervisor" rather than a "manager" under the *Glasgow* test.

Although there is case law suggesting that liability can be automatically imputed on an employer if the harassing employee has the authority to "independently hire and fire" employees, *e.g.*, *Delahunty v. Cahoon*, 66 Wn. App. 829, 836-37, 832 P.2d 1378 (1992) or significantly influence the decision-making process in personnel matters, *e.g.*, *Payne*, 77 Wn. App. at 515-16, no Washington court has defined "manager" or "supervisor" as those terms are used in the *Glasgow* test. *See* 6A WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 330.23 cmt. at 243 (1997) ("There is no Washington

case which examines the term 'manager' for purposes of imputing liability to the employing entity."). From the *Glasgow* decision itself, all that we can determine with certainty is that a manager is something more than a supervisor. *See Glasgow*, 103 Wn.2d at 407; *Delahunty*, 66 Wn. App. at 836-37.[1]

To decide whether an employer should be held strictly liable for sex discrimination created by its employees, this court must look to principles of agency. For example, in quid pro quo sexual harassment cases, "[a]n employer is strictly liable for quid pro quo harassment perpetrated by supervisory personnel who have actual or apparent authority to make employment decisions on behalf of the employer." *DeWater*, 130 Wn.2d at 135 (citing *Thompson v. Berta Enters., Inc.*, 72 Wn. App. 531, 538-39, 864 P.2d 983 (1994)). The rationale for this rule is that "[t]he actual or apparent authority invested in supervisory personnel to make employment decisions" inherently aids the supervisor in accomplishing the quid pro quo harassment and "is an essential component of quid pro quo sexual harassment" claims. *Thompson*, 72 Wn. App. at 538-39. In other words, employers are "strictly liable for quid pro quo harassment because the employer not only has given a supervisor the *opportunity* to harass subordinate employees, but has granted the supervisor the *necessary authority* with which to carry out this type of harassment." *Id.* at 538 n.7 (emphasis added); *see also DeWater*, 130 Wn.2d at 137 (applying agency principles to determine whether State can be held vicariously liable for discriminatory acts of a foster parent).

The United States Supreme Court has sensibly concluded that the same actual or apparent authority to make personnel decisions that is necessary to carry out quid pro quo

---

[1] Henningsen argues that "Washington courts consistently have applied the 'management status' test without any concern about 'management level.'" Resp't's Br. at 24. But in the cases cited by Henningsen, the requisite level of authority for automatically imputing liability on the employer for a hostile work environment created by one of its employees was not at issue. *See, e.g., Schonauer*, 79 Wn. App. at 823; *Payne*, 77 Wn. App. at 515; *Delahunty*, 66 Wn. App. at 836-37.

sexual harassment also inherently assists supervisory personnel in creating a hostile work environment:

When a person with supervisory authority discriminates in the terms and conditions of subordinates' employment, his actions necessarily draw upon his superior position over the people who report to him, or those under them, whereas an employee generally cannot check a supervisor's abusive conduct the same way that she might deal with abuse from a co-worker. When a fellow employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to a supervisor, whose "power to supervise—[which may be] to hire and fire, and to set work schedules and pay rates—does not disappear ... when he chooses to harass through insults and offensive gestures rather than directly with threats of firing or promises of promotion."

*Faragher v. City of Boca Raton*, 524 U.S. 775, 803, 118 S. Ct. 2275, 2291, 141 L. Ed. 2d 662 (1998) (citation omitted).[2] But

---

[2] Adopting these principles of agency and "Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees," the U.S. Supreme Court adopted the following rule for holding employers liable for hostile work environment:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* Fed. Rule. Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Faragher*, 524 U.S. 807-08, 118 S. Ct. at 2292-93; *accord Ellerth*, 524 U.S. 765, 118 S. Ct. 2270.

Division Three of this court has recently applied the *Faragher* analysis to a claim of hostile work environment. *See Sangster v. Albertson's Inc.*, 99 Wn. App. 156, 991 P.2d 674 (2000).

unlike quid pro quo sexual harassment, the actual or apparent authority invested in supervisory personnel to make employment decisions is not *necessary* to create a hostile work environment. Indeed, coemployees with no actual or apparent supervisory authority can create hostile work environments. *Glasgow*, 103 Wn.2d at 407; *Ellerth*, 524 U.S. at 762. Therefore, notwithstanding some case law suggesting the contrary, we conclude that under established principles of agency, an employee's actual or apparent authority to make employment decisions—standing alone—is not sufficient to hold the employer automatically liable for the employee's sexually harassing conduct.

But "[w]hen a supervisor makes a tangible employment decision [based on discrimination], there is assurance the injury could not have been inflicted absent the agency relation." *Id.* at 761–62. It is just this assurance that is found in quid pro quo harassment cases but that is not always found in hostile work environment cases, that led to the rule, as pronounced in *Glasgow*, that in hostile work environment cases "[t]o hold an employer responsible for the discriminatory work environment created by a plaintiff's supervisor(s) or co-worker(s), the employee must show that the employer (a) authorized, knew, or should have known of the harassment and (b) failed to take reasonably prompt and adequate corrective action." *Glasgow*, 103 Wn.2d at 407. Put another way, unless recognized agency principles support imputed liability, the plaintiff must establish liability on negligence principles, to be entitled to damages.

But as the *Ellerth* court explained, in the course of its discussion of why the categories quid pro quo and hostile work environment are not necessarily controlling on the issue of vicarious liability and that tangible employment action will render the employer automatically subject to vicarious liability even in hostile work environment cases involving supervisors:

> Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on

subordinates. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors. The supervisor often must obtain the imprimatur of the enterprise and use its internal processes.

For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer. Whatever the exact contours of the aided in the agency relation standard, its requirements will always be met when a supervisor takes a tangible employment action against a subordinate. In that instance, it would be implausible to interpret agency principles to allow an employer to escape liability[.]

*Ellerth*, 524 U.S. at 762-63 (citations omitted).

Here, Green took tangible employment action when, after repeatedly telling Henningsen he was sexually attracted to her, and after having sexual relations with her on the jobsite, he promoted Henningsen to the position of sales representative, although his own supervisor expressed doubts about the promotion. When Henningsen subsequently told Green that she wanted to keep their relationship on a professional, nonsexual level, Green continued to subject her to unwanted sexual attention, reminding her on a frequent basis that she owed her job to him, thereby implying that she also owed another installment payment on her debt to him. Although this same evidence supports the claim of quid pro quo harassment, it equally supports the hostile work environment claim. Under *Glasgow*, the elements of a hostile work environment claim are: (1) the complained of conduct must be unwelcome, undesirable or offensive; (2) the employee would not have suffered the harassment if he or she had been of a different sex; (3) the harassment must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment; (4) the harassment must be imputable to the employer. *Glasgow*, 103 Wn.2d at 406-07. Here, only the fourth element is at issue.

We conclude that agency principles fully support the trial

court's imposition of vicarious liability—whether Green was a "manager" or merely a "supervisor"—in that Green exercised his actual authority as WorldCom's agent when he promoted Henningsen under circumstances that left little doubt, when coupled with his previous and subsequent words and conduct, of the improper sexual basis for the promotion. Green having exercised his actual authority to promote Henningsen on that basis, WorldCom cannot now be heard to say that Green was not aided by the existence of the agency relation as he subjected Henningsen to ongoing, unwelcome, pervasive sexual harassment affecting the terms and conditions of her continued employment as a sales representative.

We deem it irrelevant that Green never followed through with the implied threat to demote or terminate Henningsen if she failed to submit to his periodic sexual advances. For one thing, Henningsen periodically submitted to Green's advances, both before and after her promotion. But more importantly for purposes of our analysis of the hostile work environment claim, federal courts now treat cases involving threats that are not carried out as hostile work environment claims, and cases involving threats that are carried out as quid pro quo harassment claims. *See Ellerth*, 524 U.S. at 754 ("Because Ellerth's claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct."). Although not all portions of Washington's Law Against Discrimination are similar to their federal counterparts, RCW 49.60.180 (defining unfair practices in employment based on sex) and section 703(a) of Title VII (forbidding employers from discriminating on the basis of sex) are substantially similar. Washington courts routinely rely on federal cases in construing the parameters of RCW 49.60.180, with respect to issues as yet undecided in Washington. Accordingly, it is desirable that Washington case law continue to keep pace with federal case law where consistent with our own statute and developing case law.

We do not read *Glasgow* to prohibit any and all means of

determining employer liability for hostile work employment claims involving supervisors other than employer negligence, where liability may be properly imputed based on recognized agency principles. *Glasgow* was argued and decided on negligence principles, not agency principles. But our Supreme Court has subsequently applied agency principles in deciding a case raising a claim of hostile work environment. *See DeWater*, 130 Wn.2d at 137-42.

We conclude that *Glasgow* does not control our decision in this appeal. After reaching a similar conclusion, Division Three of this court recently applied the *Faragher* analysis to a hostile work environment claim, in *Sangster v. Albertson's, Inc.*, 99 Wn. App. 156, 991 P.2d 674 (2000).[3] WorldCom asks us to adopt the *Faragher* analysis in this case. But we need not adopt *Faragher* to resolve this appeal because even if we were to do so, WorldCom could not take advantage of the affirmative defense under *Faragher*. This is because no affirmative defense is available under *Faragher* where the supervisor has taken tangible employment action. Here, the tangible employment action happens to have been to Henningsen's economic benefit, rather than to her economic detriment, but as *Ellerth* makes clear, the real question with respect to employer liability for a hostile work environment created by a supervisor is whether the supervisor was aided in creating the hostile work environment by the agency relation. If the supervisor were so aided, the supervisor's act becomes the act of the employer—and where there has been tangible employment action based on sexual harassment, it is clear that the supervisor *was* aided by the agency relation. *Ellerth*, 524 U.S. at 762. Here, although the tangible employment action was a promotion rather than a demotion or other action having adverse economic consequences, the promotion was coupled with repeated sexual demands and implicit threats of adverse employment consequences unless Henningsen continued to pay what Green felt she owed him for the promotion. The hostile work environment thereby created

---

[3] *See* note 2, *supra*.

was inextricably tied to the tangible employment decision. Accordingly, we conclude that the trial court did not err in imputing liability to WorldCom for Green's conduct giving rise to the hostile work environment claim.

## II. Quid Pro Quo Sexual Harassment Claim

WorldCom does not dispute that Henningsen had a valid claim for quid pro quo harassment based on Green's request for sexual favors and Henningsen's subsequent promotion, but contends that Henningsen's quid pro quo sexual harassment claim is time-barred under the three-year statute of limitations, RCW 4.16.080(2), because her promotion to sales representative—the last tangible employment action related to Green's quid pro quo sexual harassment of Henningsen, according to WorldCom—occurred more than three years before she filed suit. Although the trial court's judgment is fully supported by our ruling with respect to the hostile work environment claim, and we ordinarily would not need to address the quid pro quo harassment claim, here, the tangible employment action that supports vicarious liability for the hostile work environment claim is that same promotion—which indeed occurred more than three years before Henningsen filed the instant lawsuit. Accordingly, we will decide the statute of limitations question as it relates to the quid pro quo harassment claim.

■ If the quid pro quo promotion stood alone as the basis for Henningsen's claim, we would agree with WorldCom that the claim was stale. But though a plaintiff generally cannot base a quid pro quo sexual harassment claim on an incident that occurred outside the statute of limitations, it does not necessarily follow that the plaintiff cannot present evidence of such an incident to support a quid pro quo sexual harassment claim based on an incident that occurred within the statute of limitations. For example, evidence from the incident that occurred outside the statute of limitations may be admissible under the Rules of Evidence to establish the harasser's "motive, opportunity,

intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b); *see also Jones v. Clinton*, 993 F. Supp. 1217, 1222 (E.D. Ark. 1998) ("The Court readily acknowledges that evidence of the Lewinsky matter might have been relevant to plaintiff's case and, as she argues, that such evidence might possibly have helped her establish, among other things, intent, absence of mistake, motive, and habit on the part of the President.") (footnote omitted).

The trial court found that Henningsen continued to suffer quid pro quo harassment after her promotion:

> Following the Plaintiff's becoming a sales rep, Mr. Green continued to reinforce the bargained-for nature of her promotion by repeatedly reminding her "You owe me. No one else wanted to give you the job. You owe me." The clear explicit message was that she had more to pay for the job benefit he had bestowed upon her and the implicit message was that the tender for repayment was sexual in nature.

Clerk's Papers at 2938 (Trial Court's Mem. Op.).

The evidence in the record supports the trial court's analysis. Henningsen made her final installment payment, as it were, within the three-year statute of limitations, i.e., in October 1993, less than three years before she filed suit. In the typical quid pro quo harassment case, and this is certainly a classically typical case, an employee seeks damages from an employer's extortion or attempted extortion of sexual favors in exchange for a job benefit or the absence of a job detriment. *Schonauer*, 79 Wn. App. at 823. Here, Green extorted and attempted to extort sexual favors from Henningsen, as additional payment for the promotion or to avoid a job detriment, until his position with WorldCom was eliminated in November 1994—well within the limitation period. Accordingly, Henningsen's quid pro quo harassment claim had not expired, even though the promotion itself took place more than three years before she filed suit. This ruling provides an independent basis for the trial court's judgment for damages.

### III. Back Pay Award

WorldCom contends that the trial court erred in awarding Henningsen full back pay because there was evidence that she "traveled extensively, had a baby, married the baby's father, and then proceeded to assist him in the management of his own business" after she left WorldCom. Appellant's Reply Br. at 20. Henningsen contends that the trial court properly concluded that WorldCom failed to satisfy its burden of proving that she failed to mitigate her damages.

■ ■ "[T]he burden of proving a failure to mitigate damages in an employment discrimination suit [is] on the defendant." *Burnside v. Simpson Paper Co.*, 66 Wn. App. 510, 529, 832 P.2d 537 (1992), *aff'd*, 123 Wn.2d 93, 864 P.2d 937 (1994); *accord Kloss v. Honeywell, Inc.*, 77 Wn. App. 294, 301, 890 P.2d 480 (1995). " 'To satisfy its burden, the [employer] must show that there were suitable positions available and that the plaintiff failed to use reasonable care and diligence in seeking them.' " *Id.* at 301 (quoting *Burnside*, 66 Wn. App. at 529). "Once discrimination has been found, any doubts concerning back pay are to be resolved against the employer." *Burnside*, 66 Wn. App. at 531. The plaintiff's failure to "make an ongoing, concerted effort to find comparable employment" does not preclude a back pay award. *Id.* at 530.

In the present case, there is evidence that Henningsen failed to make an ongoing, concerted effort to find comparable employment. In fact, the trial court expressed "some concerns about [Henningsen's] underemployment in 1997[.]" Clerk's Papers at 2942. But there is also evidence that she worked on a limited basis for her husband's business and tried to start a home business. And most importantly, WorldCom presented no evidence that employment comparable to her position at WorldCom was in fact available. Therefore, substantial evidence supports the trial court's finding that WorldCom did not prove that Henningsen failed to mitigate her back pay damages.

## IV. Attorney Fee Award

■ In Washington, the preferred method for determining reasonable attorney fees is the lodestar method. *Mahler v. Szucs*, 135 Wn.2d 398, 433, 957 P.2d 632, 966 P.2d 305 (1998); *Scott Fetzer Co. v. Weeks*, 114 Wn.2d 109, 124, 786 P.2d 265 (1990).

> "Under this method, there are two principal steps to computing an award of fees. First, a "lodestar" fee is determined by multiplying a reasonable hourly rate by the number of hours reasonably expended on the lawsuit. Second, the "lodestar" is adjusted up or down to reflect factors, such as the contingent nature of success in the lawsuit or the quality of legal representation, which have not *already* been taken into account in computing the "lodestar" and which are shown to warrant the adjustment by the party proposing it."

*Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 593-94, 675 P.2d 193 (1983) (quoting *Miles v. Sampson*, 675 F.2d 5, 8 (1st Cir. 1982). Although an adjustment to the lodestar amount is within the trial court's discretion, there is a presumption that the lodestar amount represents a "reasonable fee." *Xieng v. Peoples Nat'l Bank*, 63 Wn. App. 572, 587, 821 P.2d 520 (1991) (citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711, 728, 107 S. Ct. 3078, 97 L. Ed. 2d 585 (1987)), *aff'd*, 120 Wn.2d 512, 844 P.2d 389 (1993). Adjusting the lodestar amount upward or downward is appropriate "in rare instances." *Mahler*, 135 Wn.2d at 434.

In this case, the trial court, without explanation, used a 1.25 multiplier on the hours expended by Andrea Brenneke, Henningsen's lead counsel. WorldCom contends that an enhancement is not justified. Henningsen contends that the contingent nature of the case and the quality of the representation justified the enhancement.

■ To permit appellate review, a trial court must enter findings of fact and conclusions of law supporting a fee award under the lodestar method. *Id.* at 435. This is particularly important in the rare instances where the trial

court exercises its discretion to adjust the lodestar amount upward or downward. In this case, however, we are left to guess at the reason or reasons why the trial court applied a multiplier to the hours expended by Brenneke. Therefore, we remand so that the trial court can enter findings and conclusions to support the fee enhancement.[4]

V. Attorney Fees on Appeal under RCW 49.60 -.030(2)

Henningsen having prevailed as to the merits of her discrimination claims, she is entitled under RCW 49.60.030(2) to be awarded reasonable attorney fees on appeal. A commissioner of this court will determine a reasonable fee, upon Henningsen's compliance with the requirements of RAP 18.1(d).

The trial court's judgment for damages is affirmed. The judgment for attorney fees below is vacated pending entry of findings of fact and conclusions of law, following remand, as required by this opinion.

WEBSTER and APPELWICK, JJ., concur.

---

[4] Although we remand for entry of findings to support the attorney fee award and enhancement, this is a decision terminating review.