[No. 48097-9-I. Division One. March 25, 2002.]

JODI KUEST, *Appellant*, v. REGENT ASSISTED LIVING, INC., *Respondent*.

38

*Jerry R. McNaul* and *Gregory J. Hollon* (of *McNaul Ebel Nawrot Helgren Vance, P.L.L.C.*), for appellant.

*Scott L. Fredericksen* (of *Stoel Rives, L.L.P.*), for respondent.

GROSSE, J. — Washington law prohibits employment discrimination against women based on their potential to become pregnant and Jodi Kuest has raised a material issue of fact as to whether she was fired on that basis. Further, it is a question of fact whether Regent Assisted Living, Inc.'s written policies regarding progressive discipline may have modified the at-will nature of Kuest's employment contract by containing promises of specific treatment in specific situations. The trial court's determinations to the contrary are reversed.

## FACTS

Regent Assisted Living, Inc., (Regent) hired Kuest in early 1998 as the general manager of their Northshore facility, then under construction. Regent emphasized that it needed Kuest to begin her employment within two weeks of hire, even though her current employer needed at least three weeks' notice prior to her leaving in order for Kuest to be rehired in the future. Kuest left her five-year position as a department supervisor at an Alzheimer's care unit, allegedly on oral assurances that she would have a long history with Regent and that Regent used progressive disciplinary methods.

After accepting the position, Kuest signed a written employment contract and an acknowledgment that included a disclaimer that her employment was at will and that Regent's policies did not constitute a contract with Kuest. After beginning her employment, Kuest received an employee handbook that contained a second copy of the disclaimer, and a supervisor's manual that contained the terms of Regent's "Progressive Disciplinary Policy." Kuest was instructed to use the disciplinary policy prior to terminating employees.

Kuest had no experience managing a start-up facility, but she received positive feedback for several months on her progress as a general manager and the progress of the fledgling Northshore facility. Kuest also received constructive feedback regarding the Northshore facility's enrollment numbers, budgetary concerns, and staffing issues. At a managers meeting in late October, two of her supervisors inquired about her childbearing plans and Kuest admitted that she planned to have children. She was fired two weeks later. Regent replaced Kuest with a woman nearly 60 years of age.

Kuest wrote a letter to Regent's personnel department requesting information regarding her termination. Six weeks after her termination, Kuest received a "Counseling Statement/Corrective Action Form" dated the day of her termination. The statement listed meetings in September and October under "Previous Corrective Action," and the reasons listed under "Incident" leading to Kuest's termination were a combination of budget excesses, family and resident complaints, lack of assistance in coordinating a publicity event, and failure to complete a facility checklist.

Kuest sued Regent for sex discrimination, wrongful termination based on violations of express and implied contracts, and promissory estoppel. Regent countered that it terminated Kuest for legitimate and nonpretextual reasons as listed in the termination documents. Regent also claimed that other deciding factors in Kuest's termination included high staff turnover and poor management skills. The trial court determined that Kuest had not carried her evidentiary burden of raising any triable issue of fact, awarded summary judgment to Regent, and granted Regent deposition costs pursuant to RCW 4.84.010. Kuest appeals all rulings. We apply the usual standard of review.[1]

---

[1] *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

42

## DISCUSSION

1. Sex Discrimination Claim.

█ Chapter 49.60 RCW provides:

It is an unfair practice for any employer:

. . . .

(2) To discharge or bar any person from employment because of age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical disability . . . .[2]

Regent has more than eight employees, and thus is an employer that must comply with the provisions of chapter 49.60 RCW and its interpretive regulations at chapter 162-30 WAC.[3] Furthermore, although Regent contends otherwise, at the time of Kuest's termination the prohibition against sex discrimination included discrimination against a woman based on her potential to become pregnant.

The legislative purpose of chapter 49.60 RCW provides:

This chapter . . . is an exercise of the police power of the state for the protection of the public welfare, health, and peace of the people of this state, and in fulfillment of the provisions of the Constitution of this state concerning civil rights. The legislature hereby finds and declares that practices of discrimination against any of its inhabitants because of race, creed, color, national origin, families with children, sex, marital status, age, or the presence of any sensory, mental, or physical disability . . . are a matter of state concern, that such discrimination threatens not only the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state.[4]

RCW 49.60.180, addressing the unfair practices of employers, provides that an employer cannot "discharge or bar

---

[2] RCW 49.60.180(2).

[3] RCW 49.60.040; RCW 49.60.120(3); *Marquis v. City of Spokane*, 130 Wn.2d 97, 111, 922 P.2d 43 (1996); *Wash. Water Power Co. v. Wash. State Human Rights Comm'n*, 91 Wn.2d 62, 68-69, 586 P.2d 1149 (1978).

[4] RCW 49.60.010. This is the same statute in effect in 1998.

any person from employment because of . . . sex."[5] Additionally, at the time of Kuest's termination, former WAC 162-30-020 (1973), interpreting RCW 49.60.180 regarding sex discrimination in employment practices, stated:

> **Treatment of employed women.** It is an unfair practice for an employer to discharge a woman, penalize her in terms or conditions of employment, or in any way limit the job opportunities of a woman because she is pregnant or may require time away from work for childbearing.[6]

We believe the prohibition against sex discrimination under RCW 49.60.180 in 1998 clearly encompassed discrimination based on a woman's potential to become pregnant and her need to have time away from work for childbearing, prior to the change in the administrative code, specifically including this form of discrimination. Regent's interpretation of the regulations that existed at the time of Kuest's termination impermissibly narrows the broad purpose and coverage of chapter 49.60 RCW.[7] Thus, we hold that if Regent terminated Kuest based on her potential to become pregnant it committed sex discrimination prohibited by chapter 49.60 RCW.

■ ■ To establish a discrimination claim, a plaintiff must first illustrate that the plaintiff has a prima facie

---

[5] RCW 49.60.180(2). This is the same statute in effect in 1998.

[6] Former WAC 162-30-020(4) (1973). The current version of WAC 162-30-020, amended in 1998, now provides in part:

> (2) **Findings and definitions.** Pregnancy is an expectable incident in the life of a woman. Discrimination against women because of pregnancy or childbirth lessens the employment opportunities of women.

> (a) "Pregnancy" includes, but is not limited to, pregnancy, the potential to become pregnant, and pregnancy related conditions.

> . . . .

> (3) **Unfair practices.**

> (a) It is an unfair practice for an employer, because of pregnancy or childbirth, to:

> (i) Refuse to hire or promote, terminate, or demote, a woman[.]

[7] *Marquis*, 130 Wn.2d at 108 (citing *Shoreline Cmty. Coll. Dist. No. 7 v. Employment Sec. Dep't*, 120 Wn.2d 394, 406, 842 P.2d 938 (1992)).

case.[8] A plaintiff alleging sex discrimination must show: (1) membership in a protected class; (2) the employee is qualified for the employment position or performing substantially equal work; (3) an adverse employment decision including termination or denial of promotion; and (4) selection by the employer of a replacement or promoted person from outside the protected class.[9] The employee alleging discrimination must establish specific and material facts to support each element of his or her prima facie case.[10]

If a prima facie case is established, a " 'legally mandatory, rebuttable presumption' of discrimination temporarily takes hold" and the employer must produce sufficient evidence of a legitimate and nondiscriminatory explanation for the employment action.[11] If the employer meets this burden of production, the presumption established by the prima facie evidence is rebutted and the employee must then provide evidence of pretext.[12]

As the court stated in *Hill v. BCTI Income Fund-I*, while a prima facie case, plus evidence sufficient to disbelieve the employer's explanation for the termination, will ordinarily suffice to raise the issue of pretext and require a full trial, it will not always be the case:

> "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case

---

[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

[9] *Marquis*, 130 Wn.2d at 113-14; *Kuyper v. Dep't of Wildlife*, 79 Wn. App. 732, 735, 904 P.2d 793 (1995). *See also Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 181, 23 P.3d 440 (2001) (citing *McDonnell Douglas*, 411 U.S. at 802).

[10] *Marquis*, 130 Wn.2d at 105 (citing *Hiatt v. Walker Chevrolet Co.*, 120 Wn.2d 57, 66-67, 837 P.2d 618 (1992)).

[11] *Hill*, 144 Wn.2d at 181 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

[12] *Hill*, 144 Wn.2d at 182 (citing *McDonnell Douglas*, 411 U.S. at 804).

and that properly may be considered on a motion for judgment as a matter of law."[13]

However, once evidence supporting a prima facie case, a nondiscriminatory explanation, and pretext have been presented and "the record contains *reasonable but competing* inferences of *both* discrimination *and* nondiscrimination, 'it is the jury's task to choose between such inferences.' "[14]

■ It is clear that Kuest is a member of a protected class under chapter 49.60 RCW and that she was discharged soon after her superiors asked her about her childbearing plans and she admitted she planned to have children. Kuest recalls that when the question was asked there was no context of discussions about family issues and she was sufficiently disturbed that she called her husband. Kuest's replacement was a woman nearly 60 years old, not of childbearing age, and thus outside the protected class of women who are likely to become pregnant. Kuest was also performing substantially equal work as other Regent managers at the time of her termination. Kuest has shown that she both hired and fired staff, looked after a budget for her site, opened and promoted the Northshore facility, and attended manager meetings. Kuest has raised sufficient facts to meet all elements of a prima facie case.

■ Regent counters that its termination of Kuest was legitimate and nondiscriminatory. Regent states Kuest failed to meet Regent's performance standards and points to Kuest's termination form. Kuest's termination form provided that Kuest had received previous corrective action in three separate meetings. Kuest's termination form also indicated that the reasons leading to Kuest's termination were budget overruns due to Kuest's mismanagement, family and resident complaints, lack of assistance in coordinating a marketing event, and failure to complete a facility checklist. These proffered reasons for Kuest's ter-

---

[13] *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 186, 23 P.3d 440 (2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-49, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

[14] *Hill*, 144 Wn.2d at 186 (quoting *Carle v. McChord Credit Union*, 65 Wn. App. 93, 102, 827 P.2d 1070 (1992)).

mination are legitimate, nondiscriminatory reasons to fire an employee.

■ However, Kuest has also provided sufficient evidence to show that Regent's alleged incidents of prior poor performance are either false, thus pretextual, or subject to serious factual dispute. During Kuest's six months of employment, she received a satisfactory performance review three months after hire and a positive note from a supervisor regarding the grand opening of the Northshore facility four months after hire and only two months prior to termination. Furthermore, the supervisor who completed Kuest's initial performance evaluation reviewed and signed off on the evaluation form just weeks before Kuest was fired. These facts tend to illustrate that Kuest was performing adequately in her job prior to termination.

With regard to other performance problems referenced in the termination document, the record shows that Regent's allegations are debatable. Regent's executives informed investors that the Northshore facility's budget overruns were consistent with start-up expenses for all of Regent's new communities. Regent's chief executive officer also acknowledged that if facility managers were terminated for overrunning their budgets, the company would have to terminate most of its managers. Although Regent claimed the Northshore facility's staff turnover under Kuest was high at 50 percent, Regent's own witnesses stated that Regent's annual staff turnover ranged anywhere from 75 to 125 percent.

Kuest alleges that she does not remember receiving any corrective action prior to her termination, contrary to the assertions in the "Counseling Statement/Corrective Action Form" which terminated her employment. Kuest's "Counseling Statement/Corrective Action Form" is identical to the form provided in Regent's supervisor manual in the section on progressive discipline. However, the previous corrective action referenced in the termination form and memos documenting these previous actions were not drafted in the "Counseling Statement/Corrective Action Form" format. It

is unclear after viewing the memos whether they document actual corrective actions against Kuest. Only one, a memo addressed to another employee and copied to Kuest, contains any specific negative language.

Further, in an operations update dated a month before Kuest's termination, Regent stated that the regional manager would deliver a written corrective action plan "detailing the following items to be complete [sic] not later than October 29, 1998 or termination will commence on 10/30/98." Kuest did not receive a corrective action plan pursuant to this memo. In contrast, another manager at Regent received a document prior to termination titled "Counseling Statement/Corrective Action Form" listing specific problems, a timeline for the problems to be completed, and the consequence of termination for failure to comply, thus conforming to Regent's own progressive disciplinary policy. There is a question of fact whether the memos Kuest actually received documented prior corrective actions. Kuest has additionally provided a wide range of proof that Regent's explanations for her termination are false. Thus, there is a question of fact whether the final termination form accurately reflects the true reasons for Kuest's termination.

■ Regent's final argument that the same decision maker both hired and fired Kuest, thus the termination should be presumed valid, is not convincing. This rule applies to infer that a person was not discharged because of any attribute the decision makers were aware of at the time of hiring.[15] Kuest's employer was not aware at the time of her hire that she planned to have children. Indeed, it might not have been aware of this until she was asked.

Although the only overt acts illustrating possible sex discrimination by Regent consist of an inquiry into Kuest's childbearing plans and her subsequent termination, Kuest has provided much evidence of pretext. Furthermore, Re-

---

[15] *Hill,* 144 Wn.2d at 189 (citing *Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, 270-71 (9th Cir. 1996)).

gent has not overcome, as a matter of law, the evidence of pretext before the court. Reviewing the facts submitted in a light most favorable to the nonmoving party, the record in this case contains *"reasonable but competing* inferences of *both* discrimination *and* nondiscrimination."[16] Thus, under *Hill*, a jury must choose between such inferences, not the trial court. Summary judgment was improper and the issue of sex discrimination should be remanded for trial.

2. Wrongful Discharge Claim.

Kuest claims wrongful discharge due to breach of contract, stating that she did not receive progressive discipline prior to her termination as required by Regent's own policies outlined in her supervisor's manual.

■ As discussed in the case of *DePhillips v. Zolt Construction Co.*, modification of the at-will nature of an employment agreement can occur by any of three means.[17] First, an express agreement may specify other terms and conditions of employment. Second, an agreement specifying other terms of employment may arise from the conduct of the parties, an implied contract.[18] Further, irrespective of the existence of an implied contract, an equitable claim may exist where the employer makes promises of specific treatment in specific situations, thus precluding the enforcement of the at-will aspect of the employment agreement.[19]

■ It is apparent that the first means is not present in this case. Issuance of an employee policy manual may contractually modify an at-will employment agreement, "[a]bsent a specific contractual agreement to the con-

---

[16] *Hill*, 144 Wn.2d at 186.

[17] *DePhillips v. Zolt Constr. Co.*, 136 Wn.2d 26, 34-37, 959 P.2d 1104 (1998).

[18] *DePhillips*, 136 Wn.2d at 36 (citing *Bott v. Rockwell Int'l*, 80 Wn. App. 326, 331 n.1, 908 P.2d 909 (1996)); *Roberts v. Atl. Richfield Co.*, 88 Wn.2d 887, 894, 568 P.2d 764 (1977).

[19] *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 230, 685 P.2d 1081 (1984); *DePhillips*, 136 Wn.2d at 36.

trary."[20] Here, there is an express agreement to the contrary.

The disclaimer at issue states in part:

> I further understand that neither the policies and procedures of the Community, as described in the Handbook or as may otherwise exist, nor the Handbook, nor any custom or practice of the Community are intended to be nor do constitute a contractual arrangement or agreement between the Community and myself of any kind including but not limited to duration of my employment with the Community. I understand that my employment is "at will" and may be terminated, with or without cause, by me or by the Community, at any time and that no employee of the Community is authorized to make nor may I rely upon any oral or written assurance of continued employment made to me, other than in writing, but the President of Regent Assisted Living.

On its face, Regent's express disclaimer is broad enough to negate inclusion of the terms of the progressive discipline policy into Kuest's employment contract, as well as other policies that existed at the time Kuest signed the disclaimer. Kuest admits that before she began employment with Regent, she signed an at-will employment contract and a disclaimer. Kuest also admits she again received the disclaimer in her employee handbook soon after beginning employment with Regent. Thus, there is no question that Kuest had both notice of and received the disclaimer prior to employment.

Here, any agreement arising by implication would contradict the express provisions of Kuest's written employment contract and the broad disclaimer. Nevertheless, Kuest claims the disclaimer was ineffective to prevent modification of her at-will employment contract by Regent's progressive discipline policies.

In *Brown v. Scott Paper Worldwide Co.*, the Supreme Court, faced with a written agreement expressly providing for employment at-will and a handbook providing for pro-

---

[20] *Brown v. Scott Paper Worldwide Co.*, 143 Wn.2d 349, 364, 20 P.3d 921 (2001) (citing *Thompson*, 102 Wn.2d at 229).

gressive discipline, framed the issue as one of contract modification:

> Whether the parties intended policies in an employment document to be part of their employment is an issue of fact subject to the *Berg [v. Hudesman,* 115 Wn.2d 657, 801 P.2d 222 (1990)] rule. An employer's right to terminate an at-will employee can be contractually modified and, thus, can be qualified by statements contained in employee policy manuals or handbooks issued by an employer to its employees. . . . If an employer creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship.[21]

This language appears to ignore the distinction between modification of the employment contract by implication, and modification arising as a matter of law, and quasi contract. If so, it misreads both *Swanson v. Liquid Air Corp.* and *Thompson v. St. Regis Paper Co.*[22] Fortunately, the court in *Bulman v. Safeway, Inc.,* retreated from this broad-brush approach, expressly recognizing that to determine whether an implied contract to terminate only for cause exists

> " 'the requisites of contract formation, offer, acceptance and consideration are necessary predicates to establishing that policies in an employment manual are part of the employees' original employment contract or part of the employment contract as modified by the parties.' "[23]

Therefore, the current state of the law recognizes that the common law at-will employment relationship may be modified by contract, express or implied, but such modification is subject to the usual rules applicable to contract formation. Further, there must be enough factual conduct inconsistent with the express terms of the original contract, including

---

[21] *Brown v. Scott Paper Worldwide Co.,* 143 Wn.2d 349, 364, 20 P.3d 921 (2001) (citing *Swanson v. Liquid Air Corp.,* 118 Wn.2d 512, 522-23, 826 P.2d 664 (1992); *Thompson,* 102 Wn.2d at 228-30).

[22] *Swanson v. Liquid Air Corp.,* 118 Wn.2d 512, 826 P.2d 664 (1992); *Thompson v. St. Regis Paper Co.,* 102 Wn.2d 219, 685 P.2d 1081 (1984).

[23] *Bulman v. Safeway, Inc.,* 144 Wn.2d 335, 351-52, 27 P.3d 1172 (2001) (quoting *Swanson,* 118 Wn.2d at 523 (quoting *Thompson,* 102 Wn.2d at 228)). *See also DePhillips,* 136 Wn.2d at 31-33.

any disclaimer to satisfy the requisites of contractual modification. Thus, Kuest must illustrate that Regent offered different employment terms after she began employment, and that she accepted those terms and gave consideration. She cannot.

Here, Regent discussed the progressive disciplinary policy with Kuest before she signed her employment contract and her disclaimer. Kuest admitted that it was her voluntary decision to accept Regent's offer of employment on the terms set forth in the letter, which included the disclaimer. The terms (or offer) in the employment contract clearly excluded the policy as part of the original employment contract, thus anticipating its existence. After Kuest began employment, she again received the disclaimer about the same time she received the disciplinary policy. The policy remained static during her employment. Kuest also failed to give any consideration after the original contract was formed which would support the "modification" she now claims.

Material facts are not at issue regarding all the required elements of contract formation. As a matter of law, Kuest's at-will employment contract was not modified by Regent's employment policies. Thus, the trial court properly dismissed Kuest's claim for wrongful termination based on express or implied contract.

Nevertheless, independent of the contractual analysis of at-will employee contracts,

> if an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises *of specific treatment in specific situations* and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship.[24]

As a prerequisite, the employee must be aware of the promises of specific treatment in specific situations, not merely an atmosphere of fair treatment, before she may

---

[24] *Thompson*, 102 Wn.2d at 230.

rely on the promises.[25] The court in *Bulman* clarified that the promises of specific treatment in specific situations must be such that the employee can justifiably rely on them.[26]

The progressive disciplinary policy in Kuest's supervisor manual appears to promise specific treatment in specific situations. Notwithstanding Regent's claims that it did not always strictly follow its progressive disciplinary policy, Kuest provided evidence to show that Regent abided by the policy during her tenure with Regent and expected her to abide by the policy. Additionally, at least one manager terminated at the same time as Kuest for census development, staff hours, human resource issues, and expense management, was given a "Counseling Statement/Corrective Action Form" prior to termination, as specified by the progressive disciplinary policy in the supervisor's manual.

Kuest claims that she did rely on the policy when she accepted and maintained employment with Regent, and that this reliance was to her detriment because she failed to give sufficient notice at her previous employment, thus rendering herself ineligible for rehire there. Kuest argues that Regent stated at her interview that she would have a long history with Regent, assured her that progressive discipline was important to Regent, and provided her with documentation detailing progressive discipline after she began employment. Viewing the record in a light most favorable to the nonmoving party, Kuest has shown that material facts are in dispute regarding whether Regent promised specific treatment in specific situations, whether Regent should have reasonably expected Kuest to rely on the promises, and whether Kuest relied on the promises.

However, since she signed a broad disclaimer prior to employment, it is more difficult to determine whether

---

[25] *Bulman*, 144 Wn.2d at 342-44.

[26] *Bulman*, 144 Wn.2d at 352-53. Note, the basis for *Bulman*'s justifiable reliance element appears to be the standard promissory estoppel analysis as found in *Klinke v. Famous Recipe Fried Chicken, Inc.*, 94 Wn.2d 255, 259 n.2, 616 P.2d 644 (1980).

Kuest's reliance on the policy is justifiable. In *Thompson* the court recognized that employers are not bound by statements that do not amount to promises of specific treatment, and need not be bound by mere general statements of company policy if the company states in a conspicuous manner that nothing contained in the employment manual is intended to be part of the employment relationship.[27] However, in *Swanson*, while affirming the holding of *Thompson*, the court also stated:

> We reject the premise that this disclaimer can, as a matter of law, effectively serve as an eternal escape hatch for an employer who may then make whatever unenforceable promises of working conditions it is to its benefit to make.
>
> An employer's inconsistent representations can negate the effect of a disclaimer[.][28]

Like the plaintiff in *Swanson*, Kuest received the progressive disciplinary policy and was repeatedly told to use it *after* she signed the disclaimer.[29] Kuest testified that prior to accepting employment at Regent, she received oral assurances that she would have a long history with Regent and that Regent followed a progressive disciplinary policy. Regent also continued to use the policy after Kuest was hired.

Therefore, we believe that the effect of the disclaimer must be resolved by the trier of fact.[30] Material facts are in dispute on whether Regent negated the effect of the disclaimer through later inconsistent representations and practices and whether Kuest justifiably relied on these representations, rather than the disclaimer. This issue was improperly resolved on summary judgment.

Finally, the trial court exceeded the award of allowable deposition costs under RCW 4.84.010 when it awarded the

---

[27] *Thompson*, 102 Wn.2d at 230-31.

[28] *Swanson*, 118 Wn.2d at 532.

[29] *Swanson*, 118 Wn.2d at 530-31.

[30] *Swanson*, 118 Wn.2d at 528, 534; *see also Bulman*, 144 Wn.2d at 350.

entire cost of the deposition. The statute allows only a pro rata award of expenses for those portions of depositions introduced into evidence or used for purposes of impeachment. However, since we remand for further proceedings, any amount of costs must await the determination of the prevailing party.

We reverse and remand on the issues of sexual discrimination and promissory estoppel.

BAKER, J., and WEBSTER, J. Pro Tem., concur.

Reconsideration denied November 20, 2002.