# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| ELIZABETH BROOKS and JASON BROOKS, husband and wife, | ) ) ) ) | No. 69332-8-I |
|  | ) | DIVISION ONE |
| Appellants, | ) ) |  |
| v. | ) ) |  |
| BPM SENIOR LIVING COMPANY, aka STERLING PARKS, LLC, | ) ) ) | UNPUBLISHED |
|  | ) | FILED: March 17, 2014 |
| Respondent. | ) ) |  |

2014 MAR 17 AM 9: 56

COURT OF APPEALS DIV I
STATE OF WASHINGTON

Cox, J. — Elizabeth and Jason Brooks appeal the trial court's findings of fact and conclusions of law and the judgment dismissing their claims against BPM Senior Living Company. Because the findings of fact are supported by substantial evidence and support the related conclusions of law and judgment, we affirm.

BPM operates 17 senior-living facilities in seven states, including Washington. Its corporate office is in Portland, Oregon.

In 2007, BPM's Senior Vice President of Marketing and Sales left the company. Elizabeth Brooks was promoted to Vice President of Sales, and she assumed some of the marketing responsibilities of the former Senior Vice President.

Brooks lived in Kirkland and often worked from her home office. But she had to travel regularly to the corporate office in Portland as well as to BPM's other facilities.

In February 2009, Brooks announced that she was pregnant. She had an excellent employment record. "She had never been written up, had never been counseled on improvement, and had never received negative criticism for her work performance."[1]

During that same year, the occupancy rates for BPM's facilities declined significantly and were lower than its competitors. The company's revenues also declined by more than $1.4 million below projected estimates.

In March, BPM's owner, Walter Bowen, criticized Brooks's performance because of the low occupancy rates. Bowen stated this criticism in e-mails to the president of the company, Dennis Parfitt, and to the chief operating officer, Dan Lamey.

In September, Brooks told BPM that she planned to take six weeks of maternity leave and then work part-time for an additional six weeks. But sometime after the birth of her daughter that month, Brooks decided to take 12 weeks of maternity leave before returning to work.

Four days after giving birth, Parfitt e-mailed Brooks to inform her that Bowen was searching for a new marketing and sales executive. Parfitt wrote, "I certainly don't mean in any way to alarm you, but I think it's only prudent for all of us to be aware of our options and employment opportunities if change were to

---

[1] Clerk's Papers at 60.

2

happen . . . and that includes me."[2] Brooks became concerned that her job was in jeopardy.

In October, Brooks requested that she return to work on a part-time basis. BPM granted this request, and she started working part-time in mid-November.

In early December, Parfitt pressured Brooks to resign. Parfitt suggested that Brooks take a lower-paying position that did not require travel. He also encouraged her to begin her own consulting business. And he offered three months of severance. Brooks did not accept any of these suggestions or offers. Instead, she resumed her full-time schedule in mid-December.

When Brooks returned, Parfitt told her that her last day at BPM would be on December 31 because Bowen wanted her "off the payroll."[3] But on December 30, Bowen's assistant told Brooks that she would meet with Bowen in January, indicating that Brooks was to remain with the company after the end of the year.

In mid-January 2010, Lamey, the chief operating officer, created a travel schedule for Brooks that required travel almost every week from February to April. Brooks requested a lighter travel schedule because she was nursing her baby. She said that she would travel as much as possible and would travel with her baby and mother-in-law. BPM adjusted the schedule.

On February 23, Brooks obtained a doctor's note that prohibited travel as long as she was nursing, but she did not give the note to anyone at BPM. Two

---

[2] Id. at 62 (citing Ex. 7).

[3] Id. at 64.

days later, Parfitt told Brooks that her travel obligations were suspended until she completed plans of action for BPM's facilities.

On March 10, Brooks gave the doctor's note to Parfitt and explained that "the proposed travel schedule 'seriously impacted my ability to produce milk and to feed my daughter.'"[4] The doctor stated that Brooks should not travel as long as she was nursing.

On March 16, Brooks left BPM. Brooks claims that she was terminated. BPM claims that Brooks voluntarily resigned after negotiating a severance package.

Brooks commenced this lawsuit asserting sex and disability discrimination, wrongful termination in violation of public policy, retaliation, outrage, negligent infliction of emotional distress, and loss of consortium. As the trial approached, Brooks also asserted interference with maternity leave, failure to accommodate a disability, and harassment.

During the bench trial of these claims, the court sanctioned Brooks's counsel $250 for communicating with one of BPM's speaking agents. Following the six-day trial, the court entered written findings of fact and conclusions of law and a judgment. The court dismissed all of Brooks's claims with prejudice. In the judgment, the court suspended the $250 sanction against counsel.

This appeal followed.

---

[4] Id. at 67 (quoting Ex. 49).

4

## STANDARD OF REVIEW

We review a trial court's findings of fact for substantial evidence.[5] "Substantial evidence to support a finding of fact exists where there is sufficient evidence in the record 'to persuade a rational, fair-minded person of the truth of the finding.'"[6] Unchallenged findings are verities on appeal.[7]

The findings of fact must support the trial court's conclusions of law.[8] "'Questions of law and conclusions of law are reviewed de novo.'"[9]

Mixed questions of law and fact are reviewed under these same standards.[10]

## ADVERSE EMPLOYMENT ACTION

Brooks argues that the trial court improperly concluded that she did not suffer an adverse employment action for her sex and disability discrimination claims. We disagree.

Under Washington's Law Against Discrimination (WLAD), chapter 49.60 RCW, "It is an unfair practice for any employer . . . [t]o discharge or bar any person from employment because of . . . sex . . . or the presence of any sensory,

---

[5] Hegwine v. Longview Fibre Co., Inc., 162 Wn.2d 340, 352-53, 172 P.3d 688 (2007).

[6] Id. at 353 (quoting In re Estate of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004)).

[7] Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 808, 828 P.2d 549 (1992).

[8] Hegwine, 162 Wn.2d at 353.

[9] Id. (quoting Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wn.2d 873, 880, 73 P.3d 369 (2003)).

[10] Harris v. Urell, 133 Wn. App. 130, 137, 135 P.3d 530 (2006).

mental, or physical disability."[11] It is also "an unfair practice for any employer . . . [t]o discriminate against any person in compensation or in other terms or conditions of employment because of . . . sex . . . or the presence of any sensory, mental, or physical disability."[12]

WAC 162-30-020(3) further provides, "It is an unfair practice for an employer, because of pregnancy or childbirth, to: (i) Refuse to hire or promote, terminate, or demote, a woman; (ii) Impose different terms and conditions of employment on a woman."

A plaintiff alleging discrimination must show: "(1) membership in a protected class; (2) the employee is qualified for the employment position or performing substantially equal work; (3) *an adverse employment decision including termination or denial of promotion*; and (4) selection by the employer of a replacement or promoted person from outside the protected class."[13]

In Kirby v. City of Tacoma, Division Two of this court explained that "[a]n actionable adverse employment action must involve a change in employment conditions that is more than an 'inconvenience or alteration of job

---

[11] RCW 49.60.180(2).

[12] RCW 49.60.180(3).

[13] Kuest v. Regent Assisted Living, Inc., 111 Wn. App. 36, 44, 43 P.3d 23 (2002) (emphasis added).

responsibilities.'"[14] Termination is one type of an adverse employment action.[15] "In contrast, yelling at an employee or threatening to fire an employee is not an adverse employment action."[16]

Once the plaintiff presents a prima facie case for sex discrimination, the employer must produce evidence of legitimate, nondiscriminatory reasons for its actions.[17] If the defense meets this burden, the plaintiff must show that the employer's stated reasons are pretextual.[18]

Here, Brooks asserts that she suffered three different adverse employment actions: (1) BPM firing Brooks on December 31, 2009; (2) BPM increasing Brooks's travel in January and February 2010; and (3) BPM firing Brooks in March 2010.

### December "Firing"

For the first assertion, the trial court concluded that Brooks did not suffer an adverse employment action:

> Had the company followed through with its threats to terminate Ms. Brooks by December 31, 2009, this would have constituted an adverse employment action. However, the company decided at the last minute not to pursue this course of action.[19]

---

[14] 124 Wn. App. 454, 465, 98 P.3d 827 (2004) (quoting DeGuiseppe v. Vill. of Bellwood, 68 F.3d 187, 192 (7th Cir. 1995)).

[15] See Kuest, 111 Wn. App. at 44-45.

[16] Kirby, 124 Wn. App. at 465.

[17] Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 363-64, 753 P.2d 517 (1988).

[18] Id. at 364.

[19] Clerk's Papers at 71.

This conclusion of law is supported by unchallenged findings of fact. The trial court found that Parfitt told Brooks that Bowen wanted her "off the payroll" by December 31, 2009.[20] But "[o]n December 30, 2009, Mr. Parfitt informed Mr. Lamey '[Bowen] wants to get [Brooks] back involved.'"[21] Then, "Mr. Bowen's assistant called Ms. Brooks and asked her to attend a meeting in Portland the following week, indicating that Ms. Brooks would still be employed by the company after the end of the year."[22] These unchallenged findings are verities on appeal. And a threat to fire is not actionable as an adverse employment action.[23] The trial court properly concluded that Brooks did not suffer an adverse employment action.

Brooks argues that she suffered an adverse employment action because she was "never officially reinstated" after being terminated. This argument presupposes there was a termination. There was not. Thus, this argument is not persuasive.

*Increased Travel*

For the second assertion, the trial court assumed, without deciding, "that increasing Ms. Brooks' travel responsibilities constituted an adverse employment action by virtue of being 'a reassignment with different responsibilities.'"[24] Given

---

[20] Id. at 64.

[21] Id.

[22] Id.

[23] See Kirby, 124 Wn. App. at 465.

[24] Clerk's Papers at 72 (quoting Crownover v. Dep't of Transp., 165 Wn. App. 131, 148, 265 P.3d 971 (2011)).

Bowen's "hostile emails" that coincided with her pregnancy, the trial court concluded that Brooks established a prima facie case of sex discrimination.[25]

The burden then shifted to BPM to establish that there was "legitimate, non-discriminatory explanation for the travelling requirements."[26] The trial court concluded that BPM met this burden:

> It is undisputed that by early 2010, the occupancy rates at BPM's properties had declined significantly and were lower than those of its competitors. As VP of Sales, it had always been Ms. Brooks' responsibility to travel to the company's facilities. Given the crisis in which the company found itself, BPM had legitimate, non-discriminatory reasons for insisting that Ms. Brooks retain, and even increase, her travel responsibilities.[27]

To support this conclusion, the trial court found that BPM's occupancy rates were declining and a new sales and marketing strategy was needed in 2009:

> 14. During 2009, the occupancy rates at BPM's properties declined significantly and were lower than those of its competitors. The company's revenue for 2009 was accordingly lower than annual budget estimates by more than $1.4 million. The decreasing occupancy and revenue prompted a reconsideration of sales and marketing strategy and personnel.[28]

This finding is supported by an August 16, 2009 e-mail where Bowen explained that the new director of marketing and sales would need to travel four days a week "to continually evaluate the market."[29] Moreover, this record establishes that there was both a decline in occupancy rates and projected revenues of BPM.

---

[25] Id.

[26] Id. (citing Hill v. BCTI Income Fund-I, 144 Wn.2d 172, 23 P.3d 440 (2001)).

[27] Id.

[28] Id. at 60 (citing Ex. 4, 5).

[29] Ex. 4.

It follows that sales and marketing strategy and personnel were appropriate. The findings support the court's conclusion that BPM had a legitimate, nondiscriminatory reason for its actions.

Lastly, the court concluded that Brooks did not establish that the travel schedule was pretextual:

> Ms. Brooks has not established that requiring her to travel an average of 3.6 weeks per month was a pretext for discriminating against her for having a child. Ms. Homer, the Regional Director of Sales for the southern region, who did not take pregnancy leave, testified that she travels three weeks per month.[30]

In order to show that an employer's stated rationale for an employment decision was pretextual or "unworthy of belief," a plaintiff must produce evidence from which a trier of fact could infer that the employer's "articulated reasons" for the employment decision "(1) have no basis in fact, (2) were not really motivating factors for the decision, or (3) were not motivating factors in employment decisions for other employees in the same circumstances."[31]

Here, Brooks fails to point to any evidence to show that the low occupancy rate and diminished projected revenues were not the reason for her increased travel schedule for the position she then held. Rather, there was evidence that Bowen believed that Brooks's presence at its multiple properties would increase occupancy rates.[32]

---

[30] Clerk's Papers at 72.

[31] Kirby, 124 Wn. App. at 467.

[32] Ex. 4, 31.

In sum, the trial court properly concluded that Brooks did not establish that the 2010 travel schedule was pretext for discrimination.

Brooks argues that the trial court failed to apply the correct standard in determining whether the travel schedule was pretextual. She argues that the court failed to review the facts under the "totality of the circumstances standard." But the "totality of the circumstances" is not the appropriate standard for this claim. That standard relates to one element of a hostile work environment claim.[33]

In any event, it is clear from this record that the trial court considered the travel schedule in the context of the surrounding circumstances.

Brooks argues that the only evidence to establish that BPM had a legitimate, non-discriminatory reason for the travel schedule was "self-serving statements of BPM's owner and two of its employees." She asserts that BPM failed to provide "documentation of its claims that occupancy rates were lower than at other similarly situated assisted living facilities." Brooks does not cite any authority that supports her assertion that sworn testimony is insufficient or that "documentation" is necessary to establish a legitimate, non-discriminatory reason. Accordingly, we reject this argument.

Brooks also contends that the "record is replete that the senior housing industry had been adversely affected by the housing crisis." She argues that the low occupancy rates were part of this "ongoing housing crisis" and was not new in 2010. While this assertion may be true, it does not prevent low occupancy

---

[33] See Glasgow v. Georgia-Pacific Corp., 103 Wn.2d 401, 406-07, 693 P.2d 708 (1985); Schonauer v. DCR Entm't, 79 Wn. App. 808, 820-21, 905 P.2d 392 (1995).

11

rates from being a legitimate, non-discriminatory reason for the 2010 travel schedule. Thus, this argument is not helpful.

Finally, Brooks argues that the suspension of her travel proves that the schedule was pretextual. She contends that the trial court "allowed BPM to have it both ways, claiming Ms. Brooks absolutely had to adhere to the schedule because the company was in 'crisis' without her travel, while simultaneously suspending her travel." But an unchallenged finding of fact states that BPM suspended Brooks's travel because she had not completed plans of action for each of BPM's properties.[34] Parfitt suspended her travel until Brooks completed the plans. Thus, the suspension of Brooks's travel does not call into question BPM's legitimate, non-discriminatory reason for the travel schedule. This argument is not persuasive.

*March "Firing"*

For the third assertion, the trial court also concluded that there was no adverse employment action:

> Likewise, had the company terminated Ms. Brooks' employment in March 2010, this would also have been an adverse employment action. But, as already determined, Ms. Brooks was not terminated and instead agreed to leave in return for six months of severance. The fact that she ultimately decided not to sign the Separation Agreement and Release does not convert her resignation into a termination.[35]

---

[34] Clerk's Papers at 67 (citing Ex. 45).

[35] Id. at 71.

This conclusion is supported by the challenged finding of fact that Brooks

voluntarily resigned from her job. The trial court gave four reasons why it made

this finding despite Brooks's testimony that she was involuntarily terminated:

> 52. The court credits the testimony of Mr. Parfitt on the issue of whether Ms. Brooks was involuntarily terminated, for the following reasons:

> First, Ms. Brooks' contemporaneous notes of the March 16 telephone conversation do not establish by a preponderance of the evidence that she was terminated. The notes include the term "separate ways," but not "you're being let go." In addition, Ms. Brooks' notes of a telephone conversation the next morning are more consistent with Mr. Parfitt's testimony that Ms. Brooks requested six months' severance and that Mr. Parfitt would try to get authority for that: "Walt [Bowen] not in yet. Steve felt '6 months work [sic] for him!' Understands why I want 6 mo. Fight for 6 months." Exhibit 166. An employee who has agreed to leave but wants certain terms in return is more likely to negotiate aggressively over severance pay than an employee who has been fired.

> Second, Mr. Parfitt's version is more consistent with the email he sent her shortly before the phone call, including "Let me know if you are interested in that [Overlake Terrace] [position], as I would like to see you to [sic] remain with our organization." Exhibit 51.

> Third, the cheerful tone of Ms. Brooks' subsequent correspondence with Mr. Parfitt is more consistent with a mutually agreed separation than an involuntary termination. As previous correspondence reflects, Ms. Brooks was quite capable of being assertive with Mr. Parfitt. See Exhibits 15, 49. Yet, in response to Mr. Parfitt's March 17, 2010 email in which he stated that he would have a final check for her that afternoon, Ms. Brooks wrote, "I will have my email [announcing her departure] for your review this morning!" Exhibit 53. Later, that day, after submitting the draft announcement, Ms. Brooks wrote to Mr. Parfitt: "[L]et me know what you think of the rough draft email (and, yes, you can tease me about 'too' versus 'two'!). . . . Have a drink for me!"

> Fourth, the company's March 18, 2010 Personnel Action Notice reflects a mutual parting of the ways rather than a firing. Under the "dismissal" box, the document refers [to] the following

statement at the bottom of the document: "Negotiated separation by mutual agreement and subject to separate severance agreement." After the question "would you rehire?" the "yes" box is checked. Exhibit 57.[36]

This court defers to the trial court's assessment of witness credibility and evidence weight and will not substitute its judgment for that of the trial court.[37] The court stated that it made a credibility determination on which evidence to believe and then gave detailed reasons why. We will not disturb this credibility determination on appeal.

Brooks argues that there is no proof that she voluntarily resigned. She is wrong.

She asserts that she "did not sign any documents related to a severance package," she "did not sign any Release of Claims with BPM," and she "did not sign BPM's Personnel Action Notice." The absence of these documents does nothing to diminish the force of the trial court's credibility determination that we just discussed. We reject this argument to the contrary.

Brooks also contends that "[a]n employer does not ordinarily pay severance to an employee who it decides to terminate." But Brooks provides no support for this assertion. Accordingly, we do not address it further.

In sum, the trial court properly concluded that Brooks did not suffer any adverse employment action to establish her sex and disability discrimination claims.

---

[36] Id. at 69-70 (most alterations in original).

[37] In re Welfare of Sego, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973).

## HOSTILE WORK ENVIRONMENT

Brooks argues that the trial court improperly concluded that she did not establish a hostile work environment claim.  We disagree.

To establish a prima facie case of hostile work environment, a plaintiff has the burden of showing (1) the harassment was unwelcome, (2) the harassment was because of the plaintiff's protected class such as sex or disability, (3) the harassment affected the terms or conditions of employment, and (4) the harassment is imputed to the employer.[38]

To meet the third element, the plaintiff must establish that the harassment was "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment."[39]  "Whether conduct rises to this level depends on the totality of the circumstances, '*includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.*'"[40]

Here, the trial court characterized Brooks's alleged harassment as falling into two time periods: (1) BPM "pressuring her to leave her job between

---

[38] Estevez v. Faculty Club of Univ. of Wash., 129 Wn. App. 774, 794, 120 P.3d 579 (2005).

[39] Glasgow, 103 Wn.2d at 406.

[40] Schonauer, 79 Wn. App. at 820-21 (alteration in original) (citing Glasgow, 103 Wn.2d at 406-07) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993)).

September and December 2009, and (2) BPM "pressuring her to increase her travel between January and March 2010."[41]

For the second time period, the trial court concluded that the claim failed because the pressure to increase Brooks's travel was not based on her sex. It explained that "[t]he requirement that she travel was based on the occupancy rate crisis, not on Ms. Brooks' pregnancy."[42]

For the first time period, the trial court concluded that "BPM's efforts to get Ms. Brooks to leave the company in late 2009 were related to her pregnancy."[43] To support this conclusion, it made the following unchallenged findings:

> 22. On September 24, 2009, Mr. Parfitt advised Ms. Brooks via email that the company was searching for a new executive . . . .
>
> 23. Following the September 24, 2009 email, Ms. Brooks became concerned that her job was in jeopardy. She testified that she contacted Mr. Parfitt by phone on September 25 to discuss the email, and he explained that he would do what he could to save her job.
>
> . . .
>
> 28. Mr. Parfitt met Ms. Brooks for lunch on December 10, 2009. During the lunch meeting, he offered her a lower-paying, on-site position at the Overlake Terrace property in Redmond, Washington, which she refused. He also encouraged her to begin her own consulting business and offered her a six-month contract with BPM that would run from January 2010 to June 2010. He offered her severance pay amounting to three months' salary, which she declined. According to Ms. Brooks, she was being pressured to resign. Mr. Parfitt, on the other hand, testified that he was merely helping her brainstorm ways that she could avoid having to travel so she could stay home with her child.

---

[41] Clerk's Papers at 72.

[42] Id. at 72-73.

[43] Id. at 73.

16

29. The court credits the testimony of Ms. Brooks on this issue. The impetus to leave came from the company, not from Ms. Brooks. . . .[44]

Thus, the trial court concluded that the harassment was because of Brooks's sex for this first time period, which satisfies the second element of a hostile work environment claim.

Nevertheless, the trial court concluded that Brooks failed to establish the third element, which was that the harassment was "'sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment.'"[45] The court entered the following findings and conclusions:

The court credits Ms. Brooks' testimony that while on maternity leave she had a number of phone conversations with Mr. Parfitt from which she reasonably concluded that her job was in jeopardy. Likewise, at the December 10 lunch, Mr. Parfitt pressured her to resign and become a consultant. However, there is no evidence that Mr. Parfitt ever engaged in abusive behavior towards her. While his communications were certainly upsetting to Ms. Brooks, this had to do with the possible loss of her job, not the way in which Mr. Parfitt communicated the message. Further, none of Mr. Bowen's harsh emails were disclosed to Ms. Brooks until discovery in this lawsuit. Thus, they cannot be a basis for a hostile work environment claim.[46]

The findings are supported by substantial evidence. As the trial court notes, Parfitt's e-mails and communications do not appear abusive. Rather, they have a respectful and often friendly and concerned tone. Additionally, the e-mails where Bowen criticized Brooks were not sent to Brooks. These findings together with the unchallenged findings noted above support the trial court's

---

[44] Id. at 62-63.

[45] Schonauer, 79 Wn. App. at 820 (quoting Glasgow, 103 Wn.2d at 406).

[46] Clerk's Papers at 73.

17

conclusion that Brooks failed to establish the third element of her hostile work environment claim.

Brooks argues that the trial court failed to consider the totality of the circumstances when coming to this conclusion. But the court made a number of findings that support its conclusion. There is nothing to suggest that the trial court did not consider the totality of the circumstances. Thus, this argument is not persuasive.

## DISABILITY DISCRIMINATION

Next, Brooks argue that she had a temporary disability—diminished milk production due to stress. She contends that the trial court improperly concluded that BPM attempted to accommodate this disability. We disagree.

The WLAD requires employers to reasonably accommodate a disabled employee unless the accommodation would pose an undue hardship.[47] An employee must establish four elements to prove discrimination based on lack of accommodation: "(1) the employee had a sensory, mental, or physical [disability] that substantially limited his or her ability to perform the job; (2) the employee was qualified to perform the essential functions of the job in question; (3) the employee gave the employer notice of the [disability] and its accompanying substantial limitations; and (4) upon notice, the employer failed to affirmatively

---

[47] Frisino v. Seattle Sch. Dist. No. 1, 160 Wn. App. 765, 777, 249 P.3d 1044 (2011) (citing RCW 49.60.180(2)).

18

adopt measures that were available to the employer and medically necessary to accommodate the [disability]."[48]

*Disability*

As an initial matter, BPM argues that Brooks's pregnancy-related employment discrimination claim is not subject to a disability accommodation analysis. We need not decide whether this is correct. Rather, we assume without deciding, that Brooks's alleged condition is a disability and, thus, subject to an accommodation analysis.

The WLAD defines a "disability" as "the presence of a sensory, mental, or physical impairment that: (i) Is medically cognizable or diagnosable; or (ii) Exists as a record or history; or (iii) Is perceived to exist whether or not it exists in fact."[49] "A disability exists whether it is temporary or permanent, common or uncommon, mitigated or unmitigated, or whether or not it limits the ability to work generally or work at a particular job or whether or not it limits any other activity within the scope of this chapter."[50]

In Hegwine v. Longview Fibre Co., the supreme court considered whether claims of employment discrimination because of pregnancy are subject to a disability accommodation analysis.[51] The court held that "under the plain language of the WLAD and its interpretative regulations, *pregnancy related*

_____

[48] Davis v. Microsoft Corp., 149 Wn.2d 521, 532, 70 P.3d 126 (2003) (emphasis omitted).

[49] RCW 49.60.040(7)(a).

[50] RCW 49.60.040(7)(b).

[51] 162 Wn.2d 340, 348-52, 172 P.3d 688 (2007).

*employment discrimination claims* are matters of sex discrimination."[52] "Such claims are not subject to an accommodation analysis similar to that used in the disability context."[53]

WAC 162-30-020(2)(a) states that "'[p]regnancy' includes, but is not limited to, pregnancy, the potential to become pregnant, and pregnancy related conditions." It further defines "pregnancy related conditions" as including, but not limited to, "related medical conditions, miscarriage, pregnancy termination, and the complications of pregnancy."[54]

Here, Brooks asserts diminished milk production due to stress is a temporary disability under the WLAD. BPM contends that this claimed disability is a "pregnancy related condition" and is not subject to a disability accommodation analysis under Hegwine.

As the trial court stated, it is a close question whether "an inability to breastfeed may constitute a disability" and is subject to an accommodation analysis.[55] Like the trial court, we assume without deciding that Brooks's temporary condition meets the definition of a disability and proceed to considering whether Brooks established that BPM failed to accommodate this alleged disability.[56]

---

[52] Id. at 349 (emphasis added).

[53] Id.

[54] WAC 162-30-020(2)(b).

[55] Clerk's Papers at 74.

[56] See id.

*Failure to Accommodate*

Brooks argues that "BPM made absolutely no effort to either accommodate [her] or to help her seek another job in the company at the time of her termination."[57] We disagree.

"A reasonable accommodation requires an employer to take 'positive steps' to accommodate an employee's disability."[58] "To reach a reasonable accommodation, employers and employees should seek and share information with each other to 'achieve the best match between the employee's capabilities and available positions.'"[59]

Here, the parties agree that Brooks did not notify BPM of her claimed disability until March 2010. An unchallenged finding of fact states:

> On March 10, 2010, Ms. Brooks informed Mr. Parfitt by email that the proposed travel schedule "seriously impacted my ability to produce milk and to feed my daughter. In my doctor's opinion this is negatively affecting Gracie's health as well as my own health. In her medical opinion I should not travel during the time that I am breastfeeding and I am providing you her note stating that medical fact." She provided Mr. Parfitt the note that Dr. Gong had given to her on February 23. Exhibit 49.[60]

Once Parfitt knew about her claimed disability, the trial court found that BPM offered to accommodate Brooks "by offering her a non-travelling position at

---

[57] Brief of Appellant at 28.

[58] Harrell v. Dep't of Soc. Health Servs., 170 Wn. App. 386, 398, 285 P.3d 159 (2012) (internal quotation marks omitted) (quoting Goodman v. Boeing Co., 127 Wn.2d 401, 408, 899 P.2d 1265 (1995)), review granted, 176 Wn.2d 1011 (2013).

[59] Id. (quoting Goodman, 127 Wn.2d at 409).

[60] Clerk's Papers at 67.

Overlake Terrace . . . that paid less."[61] "There is no evidence that Ms. Brooks

was interested in pursuing other lower paying jobs, preferring instead the six-

month severance package offered by BPM."[62]

These findings are supported by substantial evidence. On March 16,

2010, Parfitt wrote an e-mail to Brooks detailing her options:

> Your position always has, and always will, require regular visits to
> our properties. That said, if you wish to bring your child along on
> your business trips, as I understand you have been doing, I am
> more than happy to permit that if it is something you are interested
> in. You will be responsible however for your own child care and
> any additional travel expenses. We will continue to provide you
> time and space while at work to either breast feed or express milk,
> depending on your preference. I am also willing to take a look to
> see if there are any positions within the organization that do not
> require travel. But if you take one of those, it most likely would
> require you to work at Overlake Terrace, and the only positions I
> can think of off hand, pay a lot less than what you currently make,
> so I do not know whether that is an option you wish to discuss.
> Regardless, let me know if you are interested in that, as I would like
> to see you to remain in our organization.[63]

Given this e-mail along with the court's finding that Brooks voluntarily

resigned, the trial court properly concluded that Brooks failed to satisfy her

burden that "BPM discriminated against her in violation of the WLAD by failing to

reasonably accommodate a disability."[64]

Brooks asserts that BPM failed to accommodate her disability because

there was no formal job offer with a discussion of wage, responsibilities, title, or

---

[61] Id. at 75.

[62] Id.

[63] Ex. 51.

[64] Clerk's Papers at 75.

start date. But Brooks does not cite any authority that supports the assertion that a formal job offer is necessary and what that job offer must entail to qualify as an accommodation. Thus, we need not further consider this argument.

Brooks contends that Parfitt made no attempt to learn more about the disability. She asserts that "BPM's failure to interact with Ms. Brooks, seek more information and attempt to work with [Brooks] to find a reasonable accommodation contravenes well established Washington law."[65] But the record shows that Brooks and Parfitt communicated by e-mail and phone about her alleged disability, and they discussed Brooks's options. As previously discussed, Brooks voluntarily resigned before BPM could implement any accommodations. Thus, this argument is not persuasive.

Finally, Brooks argues that the trial court erred when it found that she could not perform the essential function of traveling "'with or without a reasonable accommodation.'"[66] She contends that she was able to travel, but she was asking for an accommodation for the frequency of her travel. While this may be true, the trial court's finding does not matter because it ultimately concluded that BPM offered to accommodate Brooks.

## RETALIATION

Brooks argues that BPM's "actions and animosity, culminating in the termination of Elizabeth Brooks, constitute retaliation for asserting her legal right

---

[65] Brief of Appellant at 29.

[66] Brief of Appellant at 29-31 (quoting Clerk's Papers at 75).

to maternity leave, her legal right to breastfeed as well as her legal right to reasonable accommodation."[67] We disagree.

"RCW 49.60.210(1) forbids employers to discharge or otherwise discriminate against an employee in retaliation for opposing practices forbidden by the [WLAD]."[68] To establish a prima facie case of retaliation, an employee must prove: "(1) The employee engaged in a statutorily protected activity, (2) the employer took adverse employment action against her, and (3) there is a causal link between the protected activity and the adverse action."[69]

"Adverse employment action means a tangible change in employment status, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"[70]

Here, as previously discussed, Brooks failed to establish that she suffered an adverse employment action. Thus, the trial court properly concluded that the retaliation claim fails.

We have already discussed and rejected Brooks's arguments to the contrary.

## INTERFERENCE WITH MATERNITY LEAVE

Brooks argues that BPM unlawfully interfered with maternity leave. We again disagree.

---

[67] Id. at 37-42.

[68] Crownover, 165 Wn. App. at 148.

[69] Id.

[70] Id. (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)).

Under RCW 49.78.220(1)(a), "an employee is entitled to a total of twelve workweeks of leave during any twelve-month period . . . [b]ecause of the birth of a child of the employee and in order to care for the child." Further, under RCW 49.78.300(1)(a), "[i]t is unlawful for any employer to . . . [i]nterfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided under this chapter."

As the trial court noted, Washington's leave statutes do not define the term "interference," and there are no Washington cases interpreting RCW 49.78.300.[71] Because the federal Family Medical Leave Act, 29 U.S.C. § 2615, contains identical language to Washington's statute, the trial court looked to federal authority for guidance. "Like the Washington leave statute, the FMLA does not define 'interference.' However, Department of Labor regulations provide that interference with an employee's right includes not only refusing to authorize FMLA leave but discouraging an employee from using such leave."[72]

Here, BPM did not prevent Brooks from taking maternity leave. Rather, the trial court found that Brooks voluntarily returned to work six weeks into her twelve week maternity leave:

> Ms. Brooks testified that she began working part time six weeks into her twelve week maternity leave because Mr. Parfitt encouraged her to show 'she was back on track.' There is no evidence, however, that Ms. Brooks was coerced into coming back early. Rather, her email communications with BPM's human resources director show that she herself wanted to return early. "I

---

[71] Clerk's Papers at 76.

[72] Id. (citing Howard v. Millard Refrigerated Servs., Inc., 505 F. Supp. 2d 867, 881 (D. Kan. 2007); 29 C.F.R. § 825.220(b); Mardis v. Cent. Nat'l Bank & Trust of Enid, 173 F.3d 864 (10th Cir. 1999)).

am excited to come back. . . . I would love to perhaps start off one day per week . . . ." Exhibit 117.[73]

This finding is supported by substantial evidence as evidenced by Brooks's e-mails identified by the trial court. Thus, the trial court properly concluded that BPM did not interfere with Brooks's right to maternity leave.

Brooks does not provide any authority to give "interfere" a different meaning than what the federal regulation provides. Thus, her arguments about the type of interference she experienced during her maternity leave are not persuasive.

## SANCTION AND NEW JUDGE

Lori Haskell, Brooks's counsel, argues that the trial court improperly imposed a sanction against her for contacting a witness without counsel present. Because the issue of sanctions is not ripe for review, we decline to address it.

Here, the imposition of sanctions is not final. In fact, the court suspended the sanctions imposed during trial when it entered judgment. If the trial court decides to impose sanctions at a later date, Haskell may raise her claim at that point.[74]

Brooks moved to supplement the record with a document regarding the witness at issue. Because we do not address this issue, we deny the motion.

_____

[73] Clerk's Papers at 76-77.

[74] See, e.g., State v. Langland, 42 Wn. App. 287, 292, 711 P.2d 1039 (1985) (explaining that Donald Langland could raise a constitutional claim if he "should find, at some future time, that his suspended sentence is revoked and the life sentence imposed" but not until then).

26

Brooks also sought a new judge in the event of reversal and remand. Because we do neither, her request is moot.

## ATTORNEY FEES

Brooks requests an award of attorney fees pursuant to chapter 49.60 RCW.  Because she does not prevail, she is not entitled to an award.

We affirm the judgment and deny an award of fees to Brooks.  We do not reach the question of sanctions because that question is not ripe for review.

_Cox, J._

WE CONCUR:

27